HUMBLE OIL & REFINING COMPANY, PETITIONER v. BOARD OF ALDERMEN OF THE TOWN OF CHAPEL HILL, JOSEPH L. NASSIF, ALICE WELSH, REGINALD D. SMITH, ROSS F. SCROGGS, GEORGE L. COXHEAD, AND JAMES C. WALLACE

No. 31

(Filed 25 January 1974)

1. **Municipal Corporations § 30— exercise of option — standing of optionee to seek special use permit**

   A prospective vendee under contract to purchase the property to be affected by the granting of a zoning variance or a special use permit is a proper party to apply therefor or to appeal a denial thereof, and the fact that he is bound to take the property only if a zoning variance or special use permit is granted does not deprive him of such standing; therefore, petitioner which exercised its option for a 20-year lease, renewable for three periods of five years, had standing to apply for a special use permit to erect and operate a service station on a site within a district zoned as "central business."

2. **Municipal Corporations § 30— zoning ordinance — definition of special use permit — procedure for granting**

   A special permit is one issued for a use which the ordinance expressly permits in a designated zone upon proof that certain facts and conditions detailed in the ordinance exist, and it is granted or denied after compliance with the procedures prescribed in the ordi-

nance, including a duly advertised public hearing on the application before a joint meeting of the Aldermen and the Planning Board and the subsequent referral of the application to the Planning Board for its consideration and recommendations.

### 3. Municipal Corporations § 30— special use permit — failure of Board of Aldermen to follow required procedure

To be valid, the action of an agency must conform to its rules which are in effect at the time the action is taken, particularly those designed to provide procedural safeguards for fundamental rights; therefore, for failure of the Board of Aldermen to comply with the terms of a city ordinance requiring reference of a request for a special use permit to the Planning Board, the Aldermen's denial of plaintiff's application for a permit must be set aside, and the application must be considered *de novo*.

### 4. Municipal Corporations § 30— denial of special use permit — insufficiency of findings to support denial

Finding by the defendant Board of Aldermen that plaintiff's proposed use of lots to erect a service station would materially increase the traffic hazard and endanger the public safety at the intersection involved was not supported by competent and sufficient evidence where that evidence consisted of opinions of citizens unsupported by factual data or background that some trees would be destroyed, there were too many service stations in the area already, a traffic signal needed to be installed, and the proposed station would interfere with a church in the intersection.

### 5. Municipal Corporations § 31— board of aldermen — review of actions

When a board of aldermen, a city council, or zoning board hears evidence to determine the existence of facts and conditions upon which the ordinance expressly authorizes it to issue a special use permit, it acts in a quasi-judicial capacity, and its findings of fact and decisions based thereon are final, subject to the right of the courts to review the record for errors of law and to give relief against its orders which are arbitrary, oppressive or attended with manifest abuse of authority.

### 6. Municipal Corporations § 31— hearing before board of aldermen — elements of fair trial required

A zoning board of adjustment, or a board of aldermen conducting a quasi-judicial hearing, can dispense with no essential element of a fair trial: (1) The party whose rights are being determined must be given the opportunity to offer evidence, cross-examine adverse witnesses, inspect documents, and offer evidence in explanation and rebuttal; (2) absent stipulations or waiver such a board may not base findings as to the existence or nonexistence of crucial facts upon unsworn statements; and (3) crucial findings of fact which are unsupported by competent, material and substantial evidence in view of the entire record as submitted cannot stand.

**7. Municipal Corporations § 30— issuance of special use permits — validity of ordinance**

Ordinance of the Town of Chapel Hill providing for issuance of special use permits was not void for lack of adequate guiding standards where the ordinance required that the Board of Aldermen follow the procedures specified in the ordinance, conduct its hearing in accordance with fair trial standards, base its findings of fact only upon competent, material, and substantial evidence, and, in allowing or denying the application, state the basic facts on which it relied with sufficient specificity to inform the parties, as well as the court, what induced its decision.

ON *certiorari* granted upon petitioner's application for review of the decision of the Court of Appeals (17 N.C. App. 624, 195 S.E. 2d 360) affirming the judgment of *McKinnon, J.,* 30 October 1972 Session of ORANGE Superior Court.

Petitioner (Humble) began this proceeding on 27 October 1971 by petition for certiorari to the Superior Court to review the refusal of the Board of Aldermen of the Town of Chapel Hill (the Aldermen) to issue it a special use permit to erect and operate an automobile drive-in service station on a site within the district zoned as "central business." The facts, stated in chronological order insofar as possible, are summarized below:

In September and October 1970 Humble acquired options to purchase and lease three adjoining lots in Chapel Hill. Together these lots front 225.2 feet on the south side of West Franklin Street and extend back approximately 100 feet between Graham Street on the east and Merritt Mill Road on the west. The western terminus of West Franklin Street is Merritt Mill Road. On the west side of Merritt, Brewers Lane and Main Street converge and enter Merritt just north of West Franklin.

One of the two lots covered by the options to purchase is now a used-car sales lot; the other is vacant. On the third, or center lot, are situated two small one-story frame houses. Humble's option on this lot is for a 20-year lease, renewable for three periods of five years. On 15 September 1971 Humble exercised its option on each of the three lots.

Each contract provided that if Humble exercised its option the optionor would immediately take all necessary steps to obtain the permits, licenses, and authorizations required for the construction and operation on the premises of a drive-in gasoline service station in accordance with Humble's plans and specifications, including "the procurement of any variances from or

change of zoning restrictions or special exceptions under zoning laws, if required to authorize the issuance of said permits, licenses, and authorizations." The options further authorized Humble, at its election, to assist the sellers and lessees and to take such action as it deemed necessary to procure the required permits, authorizations, and licenses. Humble's obligations to purchase or lease were specifically made "conditional upon all said permits, licenses and authorizations being validly and irrevocably granted, without qualification, except such as may be acceptable to purchaser, and no longer subject to appeal."

Sections 3, 4-A, 4-B, 4-C, and 4-D-6 of the Chapel Hill zoning ordinance (the ordinance) permit the construction and operation of an automobile service station in the central business district upon the approval of a special use permit by the Aldermen. On 26 July 1971 Humble filed with the Board a request for a special use permit to construct a service station on the lots described in its options. The application was accompanied by the required documents, including the written consent of the optionors to the use of the property for a service station.

The Chapel Hill Community Appearance Commission reviewed Humble's application. On 16 August 1971 it recommended that, if the Aldermen approved the requested special use permit, it make certain stipulations pertaining to a large tree, the proposed revolving sign, island canopy, and lighting fixtures. On 27 September 1971, as required by Section 4-C of the ordinance, the Aldermen and the Planning Board, after due advertisement, sat jointly at the public hearing on Humble's application. The minutes of this hearing record the following events:

J. L. Gulledge, Humble's real estate representative, argued *inter alia* that a corner lot with "setbacks on both sides" was the most desirable and safest location for a service station; that the proposed facility would replace a used-car lot, two single-story frame houses and an overgrown, untidy vacant lot; that it would substantially reduce the hazard of blind and obstructed corners and improve the appearance of deteriorating property; that it would not subtsantially change the character of the area, which already has several drive-in businesses, two car washes, other service stations, and retail establishments; and that the proposed construction and use meet all ordinance requirements for a filling station. Mr. Gulledge cited a traffic count of ap-

proximately 12,000 vehicles and 28 pedestrians per day and noted that vehicle registrations had more than doubled in the Chapel Hill area during the last ten years. In support of the application he introduced photographs of the site, the area surrounding it, the plans for the proposed station and its landscaping pictures of similar stations constructed elsewhere, and a sketch showing the flow of traffic into and out of the proposed station.

Seven persons spoke against the issuance of the special use permit. Mr. Creech "felt some of the trees would be destroyed." The Reverend Manly "said that the nearby citizens oppose[d] it and that it would be a traffic problem until a traffic light [is] installed at this intersection." Mr. Berger said there were nine service stations in the Chapel Hill central business district and eight in the adjoining Carrboro area. Mrs. Perry objected "because of the church across the intersection, and the traffic problems." Mrs. Weaver "opposed it." Alderman Nassif noted "a service station study in progress" and suggested waiting until it was completed. Alderman Smith said "that this had been a dangerous intersection for the last 28 years; that at this point five (5) streets intersect, and that the State Highway Commission had been requested many years ago to study this site for the placement of a signal, and over a year ago had approved such installation" but to date "nothing had been erected." Alderman Welsh said "that there were too many service stations in this area." Alderman Scroggs noted "that a service station is a permitted use in the central business district under the present ordinance."

At the conclusion of the hearing, without referring Humble's application to the Planning Board for its review and recommendation, the Aldermen immediately denied the permit. The minutes of the meeting show the following:

"Alderman Smith moved, seconded by Alderman Welsh, to deny the request for this special use permit for the reason that at this time the proposed use would materially increase the traffic hazard at this intersection, and increase the danger of public safety at this intersection. . . . The motion was carried by a vote of five to nothing."

Within the time prescribed by ordinance Section 10-E, Humble petitioned the Superior Court of Orange County for a writ of certiorari to review the Board's denial of its application.

It alleged that the application had been summarily denied at the public hearing without having been referred to the Planning Board as required by the ordinance and that the denial was arbitrary, capricious, and unreasonable; that the Board listened to unsupported testimony; and that the denial was based on inadequate findings of fact.

In its answer to Humble's petition for certiorari the Aldermen admitted the factual allegations contained therein, but denied the allegations that it had acted arbitrarily and illegally. The Aldermen allege, *inter alia:* (1) Upon substantial evidence the Board found that an additional filling station in the area would increase hazardous conditions already existing there; (2) the ordinance did not require it to refer Humble's request to the Planning Board before *denying* it; (3) Humble, "being the holder of options only," is not the proper party to apply for a special use permit; and (4) all the testimony at the hearing, including that presented by Humble, was unsupported in that "no sworn testimony was taken."

The Superior Court issued the writ of certiorari, and thereafter Judge McKinnon heard the matter upon "the records as described in the writ of certiorari, as certified by the town pursuant thereto," and the arguments and briefs of counsel. With one omission Judge McKinnon found facts as detailed above. He did not find that on 15 September 1971 Humble had exercised its option on the three lots upon condition that the application for the special use permit be granted. At that time this fact was not shown by the record before the court. Based upon those findings he concluded: (1) The special use permit provisions of the ordinance are not invalid; (2) the Board's finding that the granting of the requested special use permit would increase the danger to public safety in the area involved was supported by competent evidence; (3) the procedure followed by the Board of Aldermen and the denial of the special use permit without referring the matter to the Planning Board, was not arbitrary, capricious, or unreasonable; (4) the action of the Aldermen was discretionary, presumed to be legal, and Humble has the burden of proving it to have been otherwise; and (5) Humble has not shown that the action of the Board was arbitrary or capricious.

Upon the foregoing findings, Judge McKinnon entered judgment sustaining the action of the Aldermen in denying

the special use permit. From this judgment Humble appealed. The Court of Appeals affirmed it, and we allowed certiorari.

*Newsom, Graham, Strayhorn, Hedrick, Murray & Bryson by K. Byron McCoy and Malvern F. King, Jr., for petitioner appellant.*

*Haywood, Denny & Miller for respondent appellees.*

SHARP, Justice.

[1] The first question which Humble, the petitioner-appellant, discusses in its brief is whether it has standing to challenge the Board's denial of its application for the special use permit. This question was not raised at the joint hearing before the Aldermen and the Planning Board. However, in its answer to Humble's petition to the Superior Court for a writ of certiorari, after responding to the merits of each averment, the Aldermen alleged "that the petitioner is not the proper party to apply for a special use permit, it being the holder of options only. . . . ." Notwithstanding, at the hearing before Judge McKinnon the Board did not make this contention; nor did it raise this point in the Court of Appeals. That court, however, *ex mero motu,* considered the question. Relying upon *Lee v. Board of Adjustment,* 226 N.C. 107, 37 S.E. 2d 128, 168 A.L.R. 1 (1946), it held that Humble lacked standing. Even so it passed upon the assignments of error and affirmed the action of the Board in refusing to issue the special permit.

At the time Humble petitioned this Court for certiorari to review the decision of the Court of Appeals it also filed a motion suggesting a diminution of the record. Accompanying this motion were documents showing, as set forth in our statement of the facts, that Humble had conditionally exercised each of its three options. The motion to make these documents a part of the record on appeal in this Court was allowed. The question which we consider, therefore, is whether an optionee who has exercised his option upon condition that he obtain a special use permit which will enable him to use the property for the purpose he seeks to acquire it has standing to apply for the permit.

The case of *Lee v. Board of Adjustment, supra,* is factually distinguishable and does not dictate the answer to the question now posed. *See MacPherson v. City of Asheville,* 283 N.C. 299, 308, 196 S.E. 2d 200, 206-207 (1973). The applicant in *Lee* was a mere optionee. Humble, having exercised its option condition-

ally, is a prospective vendee, bound to purchase if the special use permit it seeks be granted. Humble, therefore, is the real party in interest, the only one in position to furnish the plans, specifications, and other data which under ordinance requirements, must accompany any application for a special use permit. *See Burr v. City of Keene,* 105 N.H. 228, 196 A. 2d 63 (1963).

In *Arant v. Board of Adjustment,* 271 Ala. 600, 126 So. 2d 100, 89 A.L.R. 2d 652 (1961), the Supreme Court of Alabama held that the right of a conditional vendee (such as Humble) to apply for a variance permit is equivalent to that of the vendor were he the one who desired the variance; that such a prospective purchaser is the equitable owner of the property. To hold otherwise, the Alabama Court said, would make the right to apply for a variance or special permit "depend on the identity of the owner instead of the situation of the property and the facts and circumstances of the case." *Id.* at 604, 126 So. 2d at 104. Reason and the weight of authority support the rule that a prospective vendee under contract to purchase the property to be affected by the granting of a zoning variance or a special use permit is a proper party to apply therefor or to appeal a denial thereof, and the fact that he is bound to take the property only if a zoning variance or special use permit is granted does not deprive him of such standing. *See* Annot., 89 A.L.R. 2d 663, 669, 671.

We hold that Humble had standing to apply for the special use permit and to challenge the denial of its application for the permit. This holding is in accord with the rationale of our decision in *MacPherson v. City of Asheville, supra,* decided after the decision of the Court of Appeals in this case was filed.

Humble contends that the Aldermen's denial of its application for a special use permit was arbitrary and a denial of due process in that (1) the Aldermen denied the application without first referring it to the Planning Board for study and recommendation as required by the ordinance; and (2) the Aldermen's finding that the issuance of the permit would materially increase traffic hazards and danger to the public at this intersection was unsupported by competent evidence. Humble also contends that the ordinance provisions authorizing the issuance of special use permits are invalid for lack of adequate standards governing their issuance.

Ordinance Section 4-D-6A makes the issuance of special use permits for drive-in business the duty of the Aldermen.

Subsection a. of Section 4-C-1 authorizes the Aldermen to issue special use permits for the uses listed in Section 4-D "after joint hearing with the Town Planning Board and after Planning Board review and recommendations." Subsections b, c, and d set out the requirements for the application, provide for notice and a public hearing as in case of an amendment to the ordinance, specify certain dates during each year for such hearings, and declare that "all interested persons shall be permitted to testify" at the joint hearing before the Board and the Planning Board. Subsection e requires the Planning Board to submit its recommendation to the Board within 30 days after the joint meeting at which the application is heard. Subsection f directs the Board, *on receiving the Planning Board's recommendations,* "to consider the application and said recommendation *and either grant or deny* the Special Use Permit requested." (Emphasis added.)

If the Board grants the permit Section 4-C provides that it must find:

"(1) that the use will not materially endanger the public health or safety if located where proposed and developed according to the plan as submitted and approved.

"(2) that the use meets all required conditions and specifications.

"(3) that the use will not substantially injure the value of adjoining or abutting property, or that the use is a public necessity, and

"(4) that the location and character of the use if developed according to the plan as submitted and approved will be in harmony with the area in which it is to be located and in general conformity with the plan of development of Chapel Hill and its Environs."

Subsection h requires the Board, if it denies the permit, to enter the reasons for the denial in the minutes of the meeting at which the action was taken.

We consider first whether the Court of Appeals erred in holding that the Aldermen's *denial* of Humble's application obviated the ordinance requirement that the Aldermen refer the application to the Planning Board for review and recommendation before acting upon it. That Court ruled "that before the Board of Aldermen could *issue* a special use permit, the appli-

cation would have to go to the planning board for review and recommendations, but not where, as here, the Board of Aldermen *denies* the permit." With this interpretation of the ordinance we cannot agree.

[2]  A special permit (like a special exception) is one issued for a use which the ordinance expressly permits in a designated zone upon proof that certain facts and conditions detailed in the ordinance exist. *In re Application of Ellis,* 277 N.C. 419, 178 S.E. 2d 77 (1970) ; 8 McQuillan, *Municipal Corporations* § 25.160 (3d ed., 1965) ; 101 C.J.S. *Zoning* § 271 (1958). It is granted or denied after compliance with the procedures prescribed in the ordinance. These include a duly advertised public hearing on the application before a joint meeting of the Aldermen and the Planning Board and the subsequent referral of the application to the Planning Board for its consideration and recommendations. The Aldermen may grant the application only by making the required findings, which must be supported by substantial evidence. If the application is denied, the reasons for the denial must be entered in the minutes of the meeting at which the action is taken.

That the Aldermen are to defer any action on the application for the permit until they have had the benefit of the Planning Board's investigation, consideration, and recommendation is clearly spelled out by the provision of subsection f (heretofore quoted) that on receiving the Planning Board's recommendation the Aldermen shall consider the application and recommendation and *either grant or deny* the special use permit. The obvious purpose of this provision is to insure that every application for a special use permit receives the same careful, impartial consideration. Thus, whether the application is to be allowed or denied, the Aldermen must "proceed under standards, rules, and regulations uniformly applicable to all who apply for permit." *See In re Application of Ellis, supra* at 425, 178 S.E. 2d at 81. This means that, in passing upon an application for a special permit, a board of aldermen may not violate at will the regulations it has established for its own procedure; it must comply with the provision of the applicable ordinance.

[3]  The procedural rules of an administrative agency "are binding upon the agency which enacts them as well as upon the public. . . . To be valid the action of the agency must conform to its rules which are in effect at the time the action is taken, particularly those designed to provide procedural safeguards

for fundamental rights." 2 Am. Jur. 2d *Administrative Law* § 350 (1962). In no other way can an applicant be accorded due process and equal protection, or the Aldermen refute a charge that their denial of a permit constituted an arbitrary and unwarranted discrimination against a property owner. *See Keiger v. Board of Adjustment,* 281 N.C. 715, 720, 190 S.E. 2d 175, 179 (1972).

The failure of the Aldermen to comply with the terms of the ordinance requires that its denial of Humble's application for a special use permit be set aside and that the application be considered *de novo.* We deem it expedient, therefore, to consider Humble's contention that the finding upon which the permit was denied (that to issue it would materially increase the traffic hazard and danger to the public at this intersection) is arbitrary in that it is unsupported by competent, material, and substantial evidence.

When an applicant has produced competent, material, and substantial evidence tending to establish the existence of the facts and conditions which the ordinance requires for the issuance of a special use permit, *prima facie* he is entitled to it. A denial of the permit should be based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record. *See Jackson v. Board of Adjustment,* 275 N.C. 155, 166 S.E. 2d 78 (1969); *Utilities Commission v. Tank Line,* 259 N.C. 363, 130 S.E. 2d 663 (1963). In no other way can the reviewing court determine whether the application has been decided upon the evidence and the law or upon arbitrary or extra legal considerations.

If there be facts within the special knowledge of the members of a Board of Aldermen or acquired by their personal inspection of the premises, they are properly considered. However, they must be revealed at the public hearing and made a part of the record so that the applicant will have an opportunity to meet them by evidence or argument and the reviewing court may judge their competency and materiality. *Hyman v. Coe,* 102 F. Supp. 254 (D.D.C. 1952); *Goldstein v. Zoning Board of Review of City of Warwick,* 101 R.I. 728, 227 A. 2d 195 (1967); 2 Rathkopf, *The Law of Zoning and Planning,* Ch. 64 (3d ed., 1972); 2 Yokley, *Zoning Law and Practice* § 15-17 (3d ed., 1965); Application of Imperial Asphalt Corporation, 359 Pa. 402, 59 A. 2d 121 (1948).

[4]   On the present record it appears probable that the Alder-men based their finding that Humble's proposed use of the lots in question would materially increase the traffic hazard and endanger the public safety at this intersection upon the follow-ing testimony:

Mr. Creech "felt some trees would be destroyed." Two per-sons thought there were too many service stations in this area already. One alderman wanted to wait until the completion of "a service station survey in progress." Mrs. Perry objected "because of the church across the intersection and the traffic problems." Mrs. Weaver opposed it. Alderman Smith said the intersection had been dangerous for twenty-eight years and the State High-way Commission had approved the placement of a signal not yet installed. The Reverend Manly said, "Some citizens opposed it and it would be a traffic problem until a traffic light is installed at this intersection." (Respondent appellee's brief advises us that since the denial of Humble's application eleven traffic con-trol signals have been installed in the area.)

The foregoing statements, which are conclusions unsup-ported by factual data or background, are incompetent and in-sufficient to support the Aldermen's findings. Evidence that another filling station in this area would increase the hazards at intersections affected appears to be totally lacking. That an-other filling station in the area might disperse the business and thus the traffic is a reasonable assumption, but it is not at all certain that it will increase traffic or make a dangerous inter-section more dangerous. An increase in traffic does not neces-sarily mean an intensification of traffic congestion or a traffic hazard. *Thomson Methodist Church v. Zoning Board of Review,* 99 R.I. 675, 210 A. 2d 138 (1965).

[5]   When a board of aldermen, a city council, or zoning board hears evidence to determine the existence of facts and conditions upon which the ordinance expressly authorizes it to issue a spe-cial use permit, it acts in a quasi-judicial capacity. Its findings of fact and decisions based thereon are final, subject to the right of the courts to review the record for errors in law and to give relief against its orders which are arbitrary, oppressive or attended with manifest abuse of authority. *Lee v. Board of Adjustment,* 226 N.C. 107, 37 S.E. 2d 128, 168 A.L.R. 1 (1946); *In re Pine Hill Cemeteries, Inc.,* 219 N.C. 735, 15 S.E. 2d 1 (1941).

At the time this proceeding was brought in the Superior Court judicial review of orders of zoning boards of adjustment by proceedings in the nature of certiorari was authorized by G.S. 160-178 (now G.S. 160 A-388 (1972)). In *Jarrell v. Board of Adjustment*, 258 N.C. 476, 480, 128 S.E. 2d 879, 883 (1963), this Court held that such review is adequate only "if the scope of review is equal to that under G.S. Chapter 143, Article 33, 143-306 *et seq.*" Thus the general administrative agencies review statutes were made applicable to municipal agencies. *See* Hanft, *Some Aspects of Evidence in Adjudications by Administrative Agencies in North Carolina*, 49 N.C.L. Rev. 635 (1971).

Since boards of aldermen and city councils are generally composed of laymen who do not always have the benefit of legal advice, they cannot reasonably be held to the standards required of judicial bodies. For that reason N. C. Gen. Stats., Ch. 143, Art. 33A (G.S. 143-317, 318 (Supp. 1971)), which requires that the rules of evidence as applied in the General Court of Justice shall be followed in proceedings before State agencies (with noted exceptions), was not made applicable to county and municipal agencies. We construe a State administrative agency, as that term is used in Art. 33A, to mean an authority, board, bureau, commission, committee, department, or officer whose jurisdiction is statewide.

[6] Notwithstanding the latitude allowed municipal boards, as Justice Bobbitt (now Chief Justice) pointed out in *Jarrell*, a zoning board of adjustment, or a board of aldermen conducting a quasi-judicial hearing, can dispense with no essential element of a fair trial: (1) The party whose rights are being determined must be given the opportunity to offer evidence, cross-examine adverse witnesses, inspect documents, and offer evidence in explanation and rebuttal; (2) absent stipulations or waiver such a board may not base findings as to the existence or nonexistence of crucial facts upon unsworn statements *(see Craver v. Board of Adjustment*, 267 N.C. 40, 147 S.E. 2d 599 (1966)); and (3) crucial findings of fact which are "unsupported by competent, material and substantial evidence in view of the entire record as submitted" cannot stand.

As noted by Professor Hanft in his very valuable article in 49 N.C.L. Rev. 635, 667, this Court has not indicated any test for substantial evidence; nor are we yet ready to attempt one. Instead we repeat the "realistic statement by the Supreme Court," quoted in the article: " 'Substantial evidence is more

than a mere scintilla. It means such relevant evidence as a rea-
sonable mind might accept as adequate to support a conclusion.'
It 'must do more than create the suspicion of the existence of
the fact to be established. . . . [I]t must be enough to justify,
if the trial were to a jury, a refusal to direct a verdict when
the conclusion sought to be drawn from it is one of fact for
the jury.' " *Id.* at p. 667. The quoted words are those of Mr.
Chief Justice Hughes in *Consolidated Edison Co. v. NLRB,* 305
U.S. 197, 229 (1938), and of Mr. Justice Stone in *NLRB v.
Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939).

[7]    Humble's third contention, that the provisions of Ordinance
Section 4-C 1 f(1)-(4) (the special use provisions, heretofore
quoted in full) are void for lack of adequate guiding standards,
was not raised in its petition for certiorari directed to the
Superior Court. Notwithstanding, that court decreed that the
special use provisions of the ordinance "are not invalid," and
the Court of Appeals affirmed the Superior Court. We agree
with these rulings.

Some of the ordinance requirements for a special use
permit are specific; others, not susceptible of exact definition,
are necessarily stated in general terms. In our view the ordi-
nance achieves reasonable specificity. Safeguards against arbi-
trary action by zoning boards in granting or denying special
use permits are not only to be found in specific guidelines for
their action. Equally important is the requirement that in each
instance the board (1) follow the procedures specified in the
ordinance; (2) conduct its hearings in accordance with fair-
trial standards; (3) base its findings of fact only upon compe-
tent, material, and substantial evidence; and (4) in allowing or
denying the application, it state the basic facts on which it re-
lied with sufficient specificity to inform the parties, as well as
the court, what induced its decision.

The decision of the Court of Appeals is reversed, and this
cause is returned with direction that it be remanded to the
Superior Court of Orange County for entry of a judgment (1)
vacating the findings of fact and order of the Board of Alder-
men of Chapel Hill from which Humble appeals; and (2) direct-
ing the Board of Aldermen to consider Humble's application
*de novo* in accordance with the procedures specified in the ordi-
nance and the principles set forth in this opinion.

Reversed.