COX v. HANCOCK

[160 N.C. App. 473 (2003)]

═══════════

MAXINE COX, W.E. CARTER, CHESHIRE HOWARD "BUDDY" PARKER, JAMES I. CAREY, AND JEANNETTE CAREY, WILMA STROTHER, TERRY K. WAMSLEY, AND WIFE, KIM WAMSLEY, J. LEMAR WHEELER, PERCY G. ROGERS, WALTER W. CREWS, JR., DOUGLAS ADCOCK, GEORGE WHITT, AND LINDA HENSON, PETITIONERS v. FRANKLIN WILLS HANCOCK, IV, AND WIFE, ANNE HANCOCK, DAVID DRYE COMPANY, CITY OF OXFORD, MARSHALL COOPER, ANNIE NESBITT, HOWARD FRAZIER, WILLIAM O. BETTS, ALLAN BAKER, PATRICIA O. THOMAS, ELLIS BAGBY, TINGLEY MOORE, AND TOM THORNTON IN THEIR OFFI-CIAL CAPACITY AS THE OXFORD ZONING BOARD OF ADJUSTMENT, RESPONDENTS

No. COA02-1143

(Filed 7 October 2003)

**1. Zoning— application for special use permit—real party in interest**

An application for a special use permit did not fail for lack of the landowners' signature on the application. The application was submitted by the prospective vendee, who is the real party in interest.

**2. Zoning— apartment complex—unified housing development**

There was sufficient evidence supporting the Oxford Board of Adjustment's determination that an apartment complex quali-fied as a unified housing development under the Oxford zoning ordinance and qualified for a special use permit.

**3. Zoning— special use permit—required plans for storm water drainage—oral presentation**

There was sufficient evidence that an application for a spe-cial use permit contained plans for storm water drainage, as required by the zoning ordinance, where the minutes of a Board of Adjustment meeting indicated that respondent's agent orally presented the storm drainage and water removal plans.

COX v. HANCOCK

[160 N.C. App. 473 (2003)]

4. Zoning— special use permit—board of adjustment—members not present at all meetings

Neighbors opposing a special use permit for an apartment complex were not deprived of due process by a change in the membership of the board of adjustment between two meetings at which evidence was presented. The two members who did not attend the first meeting but who did attend the second were provided access to the minutes of the first meeting and to the exhibits presented by the parties. There was extensive presentation of evidence and cross-examination at the second meeting, and the change in board membership had no effect on petitioners' ability to present their arguments against the project.

5. Zoning— special use permit—acting chair of board of adjustment—relationship with landowner

Neighbors opposing a special use permit for an apartment complex were not denied due process by a familial relationship between the acting chair of the board of adjustment and respondent Franklin Hancock, who wished to sell his land to the apartment builder. The party claiming bias has the burden of proof, and there was no showing here of bias by the acting chair or that he stood to benefit from his vote on the project. Additionally, petitioners did not raise the issue before or during the board's hearing.

Appeal by petitioners from order entered 21 March 2002 by Judge James C. Spencer, Jr. in Granville County Superior Court. Heard in the Court of Appeals 18 August 2003.

*Currin & Dutra, L.L.P., by Lori A. Dutra, for petitioner-appellants.*

*Royster, Cross & Currin, L.L.P., by James E. Cross, Jr. and Drew H. Davis, for respondent-appellees.*

EAGLES, Chief Judge.

Petitioners appeal from an order affirming a decision by the Board of Adjustment of the City of Oxford to issue a Special Use Permit to respondents David Drye Company ("Drye Co.") and Mr. and Mrs. Franklin Hancock, IV. Petitioners assert three arguments on appeal: (1) that respondents did not make a prima facie showing that its application met the requirements for issuance of a permit; (2) that

the change in membership of the Board of Adjustment deprived petitioners of due process; and (3) that the familial relationship between the respondent landowners and the acting chairman of the Board deprived petitioners of due process. After careful review of the record, briefs and arguments by counsel, we affirm.

The record evidence tends to show the following. Respondent Drye Co. applied for a Special Use Permit from the City of Oxford's Board of Adjustment. Drye Co. planned to build a 130-unit apartment complex on land owned by respondents Franklin Hancock, IV, and his wife Anne Hancock. The land was located outside the City of Oxford but within the Board of Adjustment's jurisdiction. The Board of Adjustment held a public hearing on 22 October 2001. The Special Use Permit application was the only item on the Board's agenda on 22 October. Board of Adjustment members attending the four hour long 22 October meeting included Acting Chairman Tingley Moore, Pat Thomas, Tom Thornton, Allan Baker, William Betts, Chandler Currin, Jr., Marshall Cooper, and Howard Frazier. Acting Chairman Tingley Moore is married to respondent Franklin Hancock's aunt. Petitioners are landowners with homes adjacent to the subject property. At the hearing on 22 October, petitioners stated their objections to the issuance of the Special Use Permit. Petitioners presented numerous exhibits and the testimony of sixteen witnesses. The major focus of petitioners' complaints against the building project centered around an existing storm water runoff problem and fears that the proposed construction would exacerbate that problem. Respondents presented information about the drainage plan for the property and their construction plan.

The Board did not vote on the issuance of the Special Use Permit during the 22 October meeting. Maxine Cox, one of the petitioners, voiced concern about delaying the vote until the following meeting. At approximately 11:30 p.m., Acting Chairman Moore declared that the meeting was "recessed" until 5 November 2001. The parties were instructed by the City Attorney Thomas Burnette to take their exhibits with them and return the exhibits for the 5 November meeting. The City's Planning Director, Cheryl Hart, certified that the parties' exhibits were in her office and that she notified the Board members that the exhibits were available for viewing in her office before the 5 November meeting.

On 5 November 2001, the Board resumed its consideration of the Special Use Permit application filed by respondent Drye Co. The membership of the Board of Adjustment changed between the 22

October and 5 November meetings. One member who was present at the 22 October meeting, Chandler Currin, Jr., resigned before the 5 November meeting. The Board members present at the 5 November meeting were Acting Chairman Tingley Moore, Pat Thomas, Tom Thornton, Allan Baker, William Betts, Annie Nesbitt, Marshall Cooper, Howard Frazier and Ellis Bagby. Two of these members, Annie Nesbitt and Ellis Bagby, had not attended the 22 October meeting. All Board members at the 5 November meeting were provided with written minutes from the 22 October meeting. These minutes were not verbatim transcripts, but contained a summary of the exhibits and testimony from the 22 October meeting. Michael Hedrick, representing respondent Drye Co., presented several exhibits and testified further at the 5 November meeting. Petitioners, along with their counsel, were present and cross-examined Hedrick. Petitioners also presented testimony of individuals opposed to the building project. After all of the evidence was presented, the Board voted unanimously to approve the Special Use Permit. By an order entered 21 March 2002, the trial court affirmed the approval of the permit. Petitioners appeal.

As an appellate court, we must review the sufficiency and competency of the evidence presented to the Board of Adjustment in order to determine whether that evidence supported the Board's action. *See Concrete Co. v. Board of Commissioners*, 299 N.C. 620, 626, 265 S.E.2d 379, 383 (1980); *see also Grandfather Village v. Worsley*, 111 N.C. App. 686, 688, 433 S.E.2d 13, 15, *disc. rev. denied*, 335 N.C. 237, 439 S.E.2d 146 (1993). The Supreme Court has described the review of a decision about an application for a conditional use permit as including:

(1) Reviewing the record for errors in law,

(2) Insuring that procedures specified by law in both statute and ordinance are followed,

(3) Insuring that appropriate due process rights of a petitioner are protected including the right to offer evidence, cross-examine witnesses, and inspect documents,

(4) Insuring that decisions of town boards are supported by competent, material and substantial evidence in the whole record, and

(5) Insuring that decisions are not arbitrary and capricious.

*Concrete Co.*, 299 N.C. at 626, 265 S.E.2d at 383.

**[1]** Petitioners first argue that the trial court incorrectly found that substantial, competent and material evidence supported the issuance of the Special Use Permit. Petitioners contend that the application for the permit failed for three reasons: (1) the respondent landowners did not sign the application; (2) an apartment complex does not qualify as a "Unified Housing Development" allowed by Special Use Permit in the RA zone; and (3) the applicants failed to include information in the application regarding storm drainage and sanitary sewerage. We disagree.

Petitioners contend that the permit application did not comply with City of Oxford Zoning Ordinance § 630.2, which states in pertinent part:

The owner or owners of all property included in the petition for a Special Use Permit shall submit an application to the Building Inspector. Such application shall include all of the requirements pertaining to it in this section.

Oxford Zoning Ordinance § 630.2. The respondent landowners, Franklin Wills Hancock and Anne Hancock, did not sign the application for the Special Use Permit. The application was submitted by Michael Hedrick, an agent of respondent Drye Co. Petitioners argue that the application was not submitted by the property owners and does not comply with § 630.2. We disagree. The Supreme Court has held that a prospective vendee whose purchase of the property in question depends upon the granting of a Special Use Permit is the real party in interest. *See Refining Co. v. Board of Aldermen,* 284 N.C. 458, 464-65, 202 S.E.2d 129, 134 (1974). A prospective vendee is the appropriate party "in position to furnish the plans, specifications, and other data which under ordinance requirements, must accompany any application for a special use permit." *Refining Co.,* 284 N.C. at 465, 202 S.E.2d at 134 (citing *Burr v. City of Keene,* 196 A.2d 63 (N.H. 1963)). Here, respondent Drye Co. was the prospective vendee of the property. As the prospective vendee, Drye Co. was a proper party to submit the application for the Special Use Permit. Respondent Hancock was not required to sign the application or otherwise participate in the Board's decision regarding the Special Use Permit. This assignment of error is overruled.

**[2]** Petitioners next argue that the granting of the Special Use Permit was inappropriate because the definition of "Unified Housing Development" allowed by the Special Use Permit does not include a multifamily apartment complex. The property at issue here has been

zoned by the Board as being within Zone "RA," which allows for residential and agricultural uses. Oxford Zoning Ordinance § 301 contains a table of permitted uses for various zoning districts. "Unified Housing Developments" are allowed within an RA-zoned property only when a Special Use Permit is granted. Oxford Zoning Ordinance § 301. "Unified Housing Development" is defined within City of Oxford Zoning Ordinance § 612 as "consisting of one or more principal structures or buildings and accessory structures or buildings to be constructed on a lot or plot not subdivided into the customary streets and lots . . . ." Single-family dwellings, two-family dwellings and the conversion of an existing home into a two-family dwelling are allowed in the RA district without a Special Use Permit. Oxford Zoning Ordinance § 301. Multi-family dwellings are not allowed within the RA zoned district. Oxford Zoning Ordinance § 301. The Board found that the construction project planned by respondent Drye Co. was a Unified Housing Development allowable in the RA zoned district upon the granting of a Special Use Permit. The Board then granted the Special Use Permit.

On review, this Court must analyze the evidence presented to the Board to determine whether the evidence supported the Board's determination that the apartment complex qualified as a Unified Housing Development. In addition, the evidence must support the granting of the Special Use Permit. The City of Oxford Zoning Ordinance § 612 contains all the requirements for a Unified Housing Development, as follows:

612.1 The yard regulations and height regulations set forth in this ordinance may be modified for a unified housing development, provided that, for such development as a whole, excluding driveways and streets, but including parks and other permanent open spaces, densities shall not be greater than ten (10) dwelling units per acre of the site on which such development is located. No unified housing development shall contain less than two (2) acres.

612.2 The use regulations in Article 300 may be modified to permit uses which are necessary and incidental to the operation of the development, such as maintenance buildings and management offices. Such structures shall be in appropriate harmony and character with surrounding property.

612.3 Points of access and egress shall consist of a driveway or roadway at least twenty (20) feet in width and no wider

than twenty-five (25) feet, and shall be located a sufficient distance from highway intersections to minimize traffic hazards, inconvenience and congestion.

612.4 The number, width and location of curb cuts shall be such as to minimize traffic hazards, inconvenience and congestion.

612.5 Parking areas shall have a stabilized surface as approved by the Director of Public Works, and all parking areas and traffic lanes shall be clearly marked.

612.6 Storm and sanitary sewerage shall be provided, as approved by the Director of Public Works.

612.7 Adequate screening, by means of planting or fencing, may be required as needed to protect adjacent property.

612.8 Plans shall be submitted showing:

1. Topography of the site, at contour intervals no greater than five (5) feet.

2. Location and approximate size of all existing and proposed buildings and structures within the site and existing buildings and structures within five hundred (500) feet adjacent thereto.

3. Proposed points of access and egress together with the proposed pattern of internal circulation.

4. Proposed parking areas.

5. Proposed provision for storm and sanitary sewerage, including both natural and man-made features, and the proposed treatment of ground cover, slopes, banks and ditches.

612.9 Off-street parking and loading shall be provided in accordance with Article 500.

Oxford Zoning Ordinance § 612. Respondents' representative, Michael Hedrick, presented evidence satisfying each of these requirements. Hedrick testified that the apartment complex would be located on a parcel of land that was 13.1284 acres in area. The apartment complex would contain 130 units, which did not exceed the density requirement within § 612.1. The planned clubhouse and management office were shown to be incidental to the use of the remain-

ing property according to § 612.2. The apartment complex driveway, as shown by the plans, was 24 feet in width, within the 20 to 25 feet required under § 612.3. Also, the driveway was planned and placed after consultation with a Department of Transportation official, so that traffic hazards, congestion and traffic were considered. Hedrick testified that only one curb cut, as mentioned in § 612.4, was planned on Highway 158. The apartment complex plan included 1.5 parking spaces for each residential unit. In addition, the builder planned to do curbing work, provide a gutter, and layer the parking area with asphalt, although those additional improvements were not specifically required by § 612.5. The preliminary plans submitted as part of the application showed the locations of the complex's proposed connections to the City's sewer line, as required by § 612.6. Hedrick also discussed the placement of several detention basins for storm water, which were included in the preliminary plans. Respondents also submitted a landscape plan that outlined their plans to provide plants and fencing around and within the apartment complex, according to § 612.7. Respondents submitted plans showing all the amenities listed in § 612.8. Hedrick testified that the requirements of § 612.9 had been fulfilled, pointing out that all parking spaces were eight feet and six inches wide and twenty feet long, while the access areas were at least twenty feet wide. The Board was provided evidence that each requirement of § 612 was fulfilled from which it could have logically concluded that the apartment complex plan constituted a Unified Housing Development as defined in City of Oxford Zoning Ordinance § 612.

In addition to meeting the requirements of the Unified Housing Development section of the zoning ordinance, respondents also were required to show that a Special Use Permit was appropriate. According to City of Oxford Zoning Ordinance § 630.4, a Special Use Permit may be granted when an applicant demonstrates:

630.4.1 That the use will not materially endanger the public health or safety if located where proposed and developed according to the plan as submitted and approved.

630.4.2 That the use meets all required conditions and specifications of this ordinance.

630.4.3 That the use will not substantially injure the value of adjoining or abutting property, or that the use of a public necessity, and

630.4.4 That the location and character of the use if developed according to the plan as submitted and approved will be in harmony with the area in which it is to be located and in general conformity with the plan of development of the City of Oxford and its environs.

Oxford Zoning Ordinance § 630.4. Respondent Drye Co. offered evidence showing that the apartment complex would not endanger public health or safety. Hedrick testified regarding the plans for traffic control as well as the project's surface water control and containment systems. Hedrick submitted evidence tending to show that the apartment complex would actually increase the value of the surrounding property, rather than injure it. In addition, several witnesses from the community spoke in favor of the project, showing that affordable housing was a public necessity. Hedrick presented a zoning map of the city, which indicated that adjoining land on one side of the project was zoned as single-family residential land. The adjoining land on the opposite side of the project location was restricted to industrial use. Hedrick offered an opinion that the proposed apartment complex could serve as a buffer between the two areas, thus conforming with the general area. As discussed above, Hedrick also offered ample evidence that the proposed use met the requirements of zoning ordinance § 612. Accordingly, we hold that substantial, competent, and material evidence supported the Board's decision to grant the Special Use Permit. This assignment of error is overruled.

[3] Petitioners argue that respondents' application was incomplete because it did not contain plans for storm sewerage as required by Zoning Ordinance § 612.8. This topic was the main focus of many of the petitioners' objections to the project. Ordinance § 612.8 only requires the submission of proposed plans for storm drainage and water sewerage. Within the body of the written application, respondent Drye Co. did not offer any evidence demonstrating compliance with § 612.8, but on the face of the application, beside § 612.8 a typed notation stated "[s]ee accompanying sheets for each." The record on appeal does not contain these additional sheets. However, the minutes reflect that Hedrick, on behalf of respondent Drye Co., orally presented and discussed the proposed plans for two storm drainage detention ponds, along with proposals for water removal from the apartment complex site. This oral explanation took place at both the 22 October meeting and at the 5 November meeting. As a result of this evidentiary presentation, extensive discussions among the Board, petitioners and Hedrick took place at both meetings regarding the

issue of storm water drainage. This oral evidence by Hedrick was sufficient, competent and material evidence to support the Board's decision to grant the Special Use Permit. Therefore, this assignment of error is overruled.

[4] Petitioners' second contention on appeal is that they were deprived of due process as a result of the change in Board membership between the two meetings during which evidence was presented. We disagree.

In a quasi-judicial proceeding, the petitioner's claim must be afforded due process, including the opportunity for presentation of evidence and cross-examination of witnesses. *See Concrete Co.*, 299 N.C. at 626, 265 S.E.2d at 383. Petitioners argue that the eight Board members who attended the 22 October meeting were not the same members who attended the 5 November meeting. Nine Board members attended the 5 November meeting. In fact, two members of the Board, Annie Nesbitt and Ellis Bagby, were present on 5 November but had not attended the 22 October meeting. One member, Chandler Currin, Jr., attended the 22 October meeting but resigned before the 5 November meeting. The remaining seven Board members were present at both meetings. The 5 November meeting lasted approximately two hours. During both the 22 October and 5 November meetings, petitioners and their attorney were present. Petitioners offered evidence of the existing storm water drainage problem and their fears about how the proposed construction might exacerbate that problem. At both meetings, petitioners' attorney had the opportunity to cross-examine respondents' agent Hedrick and did so extensively.

Petitioners contend that the continuity of the Board was broken between the two meetings. Petitioners attempt to distinguish this case from *Baker* and *Brannock*. *See Brannock v. Board of Adjustment*, 260 N.C. 426, 132 S.E.2d 758 (1963) (per curiam) and *Baker v. Town of Rose Hill*, 126 N.C. App. 338, 485 S.E.2d 78 (1997). In *Baker*, a change in the Board's membership occurred between two meetings when evidence was presented concerning a Conditional Use Permit. *See Baker*, 126 N.C. App. at 343, 485 S.E.2d at 81-82. One new member was added to the Town Board. *Id.* However, that new member was provided with a copy of the entire record of the earlier meeting. *Id.* In *Brannock*, the membership of the Winston-Salem Zoning Board of Adjustment changed between the hearing on the special permit and the vote approving the application. *See Brannock*, 260 N.C. at 427, 132 S.E.2d at 759. However, the

COX v. HANCOCK

[160 N.C. App. 473 (2003)]

Supreme Court held that "the changes in membership did not break the continuity of the Board" because "[t]he new members had access to the minutes and records of the various hearings and the required majority participated and joined in all decisions." *Brannock*, 260 N.C. at 427, 132 S.E.2d at 759.

Here, the two members of the Board who did not attend the 22 October meeting but did attend the 5 November meeting were provided access to the minutes of the 22 October meeting at least two days before the 5 November meeting. In addition, the members of the Board were informed that all exhibits presented by the parties on 22 October were available for viewing in the City Planning Director's office prior to the 5 November meeting. This access to the minutes and exhibits from the earlier meeting, combined with the extensive presentation of evidence and cross-examination at the 5 November meeting assures that petitioners were provided with due process. The change in Board membership had no effect on petitioners' ability to present their arguments against the building project to the Board. This assignment of error is overruled.

**[5]** Petitioners also argue that the familial relationship between the Acting Chairman of the Board of Adjustment, Tingley Moore, and respondent Franklin Hancock deprived petitioners of due process. We disagree.

The Supreme Court has held that "[d]ue process requires an impartial decisionmaker." *County of Lancaster v. Mecklenburg County*, 334 N.C. 496, 511, 434 S.E.2d 604, 614 (1993). In addition, the Court held that "[a] fixed opinion that is not susceptible to change may well constitute impermissible bias, as will . . . a close familial or business relationship with an applicant." *Id.* at 511, 434 S.E.2d at 614 (citing *Crump v. Bd. of Educ.*, 326 N.C. 603, 392 S.E.2d 579 (1990); *Leiphart v. N.C. School of the Arts*, 80 N.C. App. 339, 342 S.E.2d 914 (1986)). Here, respondent landowner Hancock was married to Acting Chairman Moore's aunt. Although this raises the possibility of partiality, it is the burden of the party claiming bias to show that bias exists. *See Crump*, 326 N.C. at 615-16, 392 S.E.2d at 585. Petitioners failed to show any bias on Mr. Moore's part or that he stands to receive any benefit from his vote on the proposed project. Therefore, petitioners have not met their burden of proof to show that bias existed. In addition, petitioners did not raise this issue during or before the Board's hearing. This assignment of error is overruled.

GRANVILLE MED. CTR. v. TIPTON

[160 N.C. App. 484 (2003)]

For the reasons stated, we affirm the trial court's order affirming the decision of the Board of Adjustment of the City of Oxford to grant the Special Use Permit to respondent Drye Co.

Affirmed.

Judges TYSON and STEELMAN concur.