IN THE SUPREME COURT OF NORTH CAROLINA

No. 434PA18

Filed 3 April 2020

PHG ASHEVILLE, LLC, Petitioner

v.

CITY OF ASHEVILLE, Respondent

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 822 S.E.2d 79 (N.C. Ct. App. 2018), affirming an order entered on 2 November 2017 by Judge William H. Coward in Superior Court, Buncombe County. Heard in the Supreme Court on 6 January 2020.

> *Fox Rothschild LLP, by Kip D. Nelson and Thomas E. Terrell, Jr., for petitioner-appellee.*
>
> *Poyner Spruill LLP, by Andrew H. Erteschik, Chad W. Essick, Nicolas E. Tosco, Colin R. McGrath, and N. Cosmo Zinkow, for respondent-appellant.*

ERVIN, Justice.

The question before us in this case is whether the City of Asheville properly denied an application for the issuance of a conditional use permit submitted by PHG Asheville, LLC, seeking authorization to construct a hotel in downtown Asheville. The trial court and the Court of Appeals both held that the City had improperly concluded that PHG had failed to present competent, material, and substantial evidence tending to show that the proposed hotel satisfied the standards for the issuance of a conditional use permit set out in the City's unified development

ordinance. In seeking relief before this Court, the City argues that the Court of Appeals ignored this Court's precedents concerning the manner in which applications for the issuance of conditional use permits should be evaluated, incorrectly applied the applicable standard of review, and erroneously disregarded the City's findings of fact. After carefully reviewing the record, briefs, and arguments of the parties, we conclude that PHG presented competent, material, and substantial evidence that the proposed hotel satisfied the relevant conditional use permit standards set out in the City's unified development ordinance and that the record did not contain any competent, material, and substantial evidence tending to establish that the proposed development failed to satisfy the applicable ordinance standards. Therefore, the City lacked the authority to deny the requested conditional use permit. As a result, we affirm the Court of Appeals' decision.

On 27 July 2016, PHG submitted a conditional use permit application to the City's planning department in which it requested authorization to construct an eight-story, 185-room, 178,412 square-foot hotel and an adjoining structure containing 200 parking spaces on a tract of real property located at 192 Haywood Street. The 2.05-acre tract upon which the proposed hotel was to be located was contained in the Patton/River Gateway portion of the "Central Business District," which is outside the "Traditional Downtown Core." According to the Downtown Master Plan that the City had adopted in March 2009, the Patton/River Gateway area "should . . . accommodate

significant residential and extended-stay hotel development," with "some [of this development to occur] in taller buildings."

As a result of the size of the proposed development and its presence in the Downtown Design Review Overlay portion of the Central Business District, section 7-5-9.1 of the City's unified development ordinance required PHG to undertake a Level III site plan review of the project. The Level III site plan review process required the holding of a pre-application conference involving area representatives; staff review of the application; and review by the Technical Review Committee, the Downtown Commission, and the Planning and Zoning Commission prior to final review by the Asheville City Council. The Technical Review Committee and the Downtown Commission each recommended approval of the project subject to variances to be approved by the Planning and Zoning Commission and the making of certain modifications to the project by PHG. The Planning and Zoning Commission granted two variances relating to the project that modified the proposed lot frontage and the height of the street wall before unanimously recommending approval of the conditional use permit to the City Council.

On 24 January 2017, PHG's application for a conditional use permit came before the Asheville City Council for a quasi-judicial public hearing. According to Section 7-16-2 of the City's unified development ordinance:

> (c) *Conditional use standards.* The Asheville City Council shall not approve the conditional use application and site plan unless and until it makes the following findings, based

on the evidence and testimony received at the public hearing or otherwise appearing in the record of the case:

(1) That the proposed use or development of the land will not materially endanger the public health or safety;

(2) That the proposed use or development of the land is reasonably compatible with significant natural and topographic features on the site and within the immediate vicinity of the site given the proposed site design and any mitigation techniques or measures proposed by the applicant;

(3) That the proposed use or development of the land will not substantially injure the value of adjoining or abutting property;

(4) That the proposed use or development of the land will be in harmony with the scale, bulk, coverage, density, and character of the area or neighborhood in which it is located;

(5) That the proposed use or development of the land will generally conform with the comprehensive plan, smart growth policies, sustainable economic development strategic plan, and other official plans adopted by the city;

(6) That the proposed use is appropriately located with respect to transportation facilities, water supply, fire and police protection, waste disposal, and similar facilities; and

(7) That the proposed use will not cause undue traffic congestion or create a traffic hazard.

At the hearing before the City Council, PHG presented the testimony of three expert witnesses, including Tommy Crozier, a licensed real estate appraiser with over fifteen

years' experience in conducting property appraisals, and Kevin Dean, a registered professional engineer.

In his testimony, Mr. Crozier addressed the third standard set out in the City's ordinance, which required consideration of whether the proposed hotel would significantly injure the value of adjoining or abutting properties. Mr. Crozier testified that three properties adjoined the tract upon which the proposed hotel would be located, including an apartment building, a church, and a multi-center office building. According to Mr. Crozier, "the three adjoining properties are valued for tax purposes under $3 million," while the construction of the hotel would cost about $25 million. Mr. Crozier described the situation at issue in this case as a textbook example of the principle of progression, in which "lower valued properties are enhanced by the value of higher value[d] properties." On the basis of his examination of recent land sale transactions in the vicinity of the proposed hotel, Mr. Crozier opined that "values have increased substantially over the last few years" as a result of the construction of other hotels in the area. As a result, Mr. Crozier concluded that "[t]he proposed subject hotel will not impair the value of adjoining or abutting property" and "should meaningfully enhance the values of surrounding properties."

At the conclusion of Mr. Crozier's testimony, Vice Mayor Gwen Wisler asked Mr. Crozier whether he had considered comparable sales data involving transactions in other cities in which two hotels had been located within a quarter mile from a new hotel. After acknowledging that he had not included data of that nature in his report,

Mr. Crozier stated that "there is so much demand for new hotel rooms in the market that [this new hotel] will not impact the value negatively of any of the hotels around here" in light of the fact that downtown hotel occupancy in Asheville is around 80 to 85 percent even though occupancy rates in an efficient market at equilibrium would be approximately 65 percent. For example, Mr. Crozier testified that, following the opening of the Hyatt Place in downtown Asheville, the business of the adjoining Hotel Indigo had increased by about ten percent.

In his testimony, Mr. Dean addressed the issue of whether construction and operation of the proposed hotel would result in any undue traffic congestion or create a traffic hazard. Mr. Dean testified that he had consulted with the City's traffic engineer, who had informed him that he only needed to provide a trip generation table and the anticipated distribution of those trips in order to satisfy the relevant ordinance requirement. Based upon the industry standards applicable to traffic studies, Mr. Dean determined that new traffic at nearby intersections resulting from the construction and operation of the proposed hotel would represent less than five percent of the total traffic that passed through that intersection and would only increase the overall traffic delay at nearby intersections by approximately four seconds. In order to make these determinations, Mr. Dean testified that he had "collected peak hour traffic counts on November 10th of [2016]" and "performed a trip generation for the site based on [the] Institute of Transportation Engineer[s'] data" and information generated by appropriate software. As a result, Mr. Dean concluded

that "the proposed use will not cause undue traffic congestion or create a traffic hazard."

At the conclusion of Mr. Dean's testimony on direct examination, Councilman Cecil Bothwell asked Mr. Dean why he had based his analysis upon conditions experienced on November 10th, which was a Thursday, rather than conditions studied in the summer or in September or October, when Asheville experiences higher tourist-related traffic levels. In response, Mr. Dean testified that "traffic [studies] are only supposed to be counted between Tuesdays and Thursdays to get a typical weekday condition that's not affected by a Monday or Friday variation," that the use of this approach is "industry standard," and that traffic engineers are generally required to only conduct traffic assessments on Tuesdays through Thursdays. In addition, Councilman Bothwell questioned Mr. Dean about the queuing that already occurs at intersections near the hotel and whether the new entrance to the hotel would exacerbate existing conditions. After acknowledging that he could not argue with the Councilman Bothwell's "anecdotal stories," Mr. Dean stated that "the amount of traffic that's going to be added is only supposed to be [a] negligible increase to any [queues] that you would see" and will not "cause any undue additional issues."

Vice Mayor Wisler asked further questions about the time of day upon which Mr. Dean's study focused, about whether Mr. Dean had taken the times at which people check into and out of a hotel into account, and whether Mr. Dean had studied conditions in the summer, during which the City experienced its highest levels of

traffic. In response, Mr. Dean stated that he had collected the data upon which his study was based on "a typical weekday in November" by measuring traffic from 7:00 a.m. to 9:00 a.m. and from 4:00 p.m. to 6:00 p.m., periods which "generally represent[ ] the peak hour" of the streets that were at issue in his study. At that point, Vice Mayor Wisler asked whether Mr. Dean had taken Mr. Crozier's appraisal, which mentioned certain hotels and apartments that were either planned to be built or had just been added, into account in conducting his study. Mr. Dean replied by stating that he had not considered the information to which Vice Mayor Wisler alluded and that he had, instead, examined the impact of the proposed hotel upon existing traffic conditions. In addition, Mr. Dean stated that, if there is a higher amount of traffic near the hotel originating from sources other than the hotel itself than was contemplated in his study, the traffic resulting from the construction and operation of the hotel would constitute a smaller percentage of the overall traffic and have a smaller percentage impact upon overall traffic conditions.

Three members of the public spoke in favor of the approval of the conditional use permit. Another member of the public asked a procedural question without supporting or opposing the issuance of the permit. Charles Rawls, a native of Asheville and resident of the nearby Montford community, expressed uncertainty concerning whether he opposed the project and posed certain questions about traffic-related issues. With respect to the extent to which traffic would be entering and exiting the proposed parking deck onto North French Broad Road, Mr. Rawls

commented that, "heading south on French Broad, there is a hill there that is a blind hill" that might create an issue for persons who lacked familiarity with the area. In addition, Mr. Rawls asked "how much of the traffic coming and going to that parking garage would be happening at peak hours so that it might affect the safety of the public" and whether Mr. Dean had observed the angle and sight limitations relating to that hill. In response, Mr. Dean stated that he had not seen that hill and that "[w]e did not conduct a sight distance check, which is typically what's required." According to Mr. Dean, the North Carolina Department of Transportation "typically requires driveways to meet certain sight distance requirements" and that he had not conducted the "check" in question because his firm had not been involved in designing the site. No one presented any evidence in opposition to the approval of the proposed conditional use permit.

After Mayor Esther Manheimer closed the evidentiary hearing, Vice Mayor Wisler immediately moved that PHG's conditional use permit application be denied on the grounds that the applicant had failed to meet the first, second, third, fourth, fifth, and seventh standards set out in the City's unified development ordinance and Councilman Keith Young seconded the motion. At that point, Councilman Bothwell expressed agreement with the assertion that PHG had failed to satisfy the traffic-related standard and thanked Mr. Rawls for "discover[ing] the lack of the sight distance examination." At that point, the City Council voted unanimously to deny the conditional use permit application.

On 14 February 2017, the City entered a written order that contained forty-four findings of fact in support of its decision to deny the issuance of the requested conditional use permit on the basis of its failure to satisfy six of the seven standards set out in the City's unified development ordinance. Among other things, the City Council found as a fact that:

> 18.    An appraiser, Tommy Crozier, testified on behalf of the Applicant and presented an "Expert Report," which purported to show that CUP Standard 3 was met, *i.e.*, that the development of the Hotel would "not substantially injure the value of adjoining or abutting property." However, Mr. Crozier's testimony and the Expert Report do not contain facts and data sufficient to prove that there would not be a substantial adverse impact on such values following construction of the Hotel.

> 19.    Mr. Crozier's testimony and the Expert Report state generally, and the Council accepts as fact, that the values of property in this area of Asheville (northwest downtown) have been increasing in recent years, and that recent sales prices exceed the assessed tax values of properties in the area. There was, however, no evidence to establish the date of the tax appraisals or evidence that would indicate how these tax values would have any relevance to CUP Standard 3. There was no evidence, through facts and data, to indicate how the Hotel would affect or impact such an increase in value (assuming such an increase would continue) on the adjacent and adjoining properties.

> 20.    There was no sales data presented and there are no comparable sales in the Expert Report, which provide information about the sale prices of properties adjacent to hotels in Asheville, or elsewhere, before and after a hotel was constructed on the tract in question. In fact, there was no data through, e.g., comparable sales, that could show the before and after value of properties

adjacent to any hotels in the City, even though the Expert Report indicates there have been multiple hotels constructed in the City in recent years, and at least two in the immediate area.

21.     That property values are increasing in the area generally over time does not establish the impact of this Hotel on the adjoining and adjacent tracts, nor whether the value of those particular tracts would suffer an adverse impact if the Hotel is constructed.

22.     There was no data or comparable sales to substantiate Mr. Crozier's claim that the Hotel Indigo was in part, the reason for the recent increase in property values in this area of downtown Asheville, or to show such increases were higher or lower than in other parts of the City during the same time period.

23.     There was no evidence or data that could show the impact on the value of adjacent properties, when the proposed Hotel would be the third hotel in a several block radius.  It appears that additional hotels could increase the value of other nearby hotels, but no facts or data were provided that could establish that property with other uses would not be substantially diminished.

24.     The Expert Report also contains the following statements, which brings the reliability of the Expert Report into question:

> a.     "The information contained in the Report or upon which the Report is based has been gathered from sources the Appraiser assumes to be reliable and accurate.  The owner of the Property may have provided some of such information.  Neither the Appraiser nor C&W [Cushman & Wakefield] shall be responsible for the accuracy or completeness of such information, including the correctness of estimates, opinions,

dimensions, sketches, exhibits and factual matters. . . . . [sic]"

b.      "This report assumes that the subject will secure an affiliation with Embassy Suites or a similar chain.  If the subject does not maintain a similar affiliation, it could have a negative impact on the subject's market value."

c.      "Our financial analyses are based on estimates and assumptions which were developed in connection with this appraisal engagement.  It is, however, inevitable that some assumptions will not materialize and that unanticipated events may occur which will cause actual achieved operating results to differ from the financial analyses contained in the report, and these difference[s] may be material.  It should be further noted that we are not responsible for the effectiveness of future management and marketing efforts upon which the projected results contained in this report may depend."

25.      The CUP application does not request that the Hotel be only an Embassy Suites hotel or a "similar chain."

26.      The methodologies employed, and data provided, by the Applicant's witness, Mr. Crozier, were inadequate to allow Council to find that the Hotel would not substantially injure the value of adjoining properties.

27.      There is significant traffic in downtown Asheville near and around the Property in September and October, and in the summer months.  The vehicular traffic in the area will increase if the Hotel is constructed.

28.      The Applicant presented the testimony of a traffic engineer, Kevin Dean, as well as Mr. Dean's written

"Traffic Assessment." The Traffic Assessment did not provide any facts or data which could show the level of traffic or traffic counts for any time of the year, except during a four hour period during the day on November 10, 2016, which was a Thursday. The level of traffic in this area is much higher at other times of the year, particularly the summer months; however, there were no traffic counts or any traffic data provided for any date other than November 10.

29. Mr. Dean was not aware of the environmental conditions on November 10, 2016, or whether such conditions could have affected traffic volumes on that date.

30. The Applicant's traffic counts were done on November 10, 2016 between the hours of 7 a.m. and 9 a.m., and between the hours of 4 p.m. and 6 p.m. Under industry standards, this is apparently "assumed" to be the time of highest traffic on nearby streets, but there was no evidence which could establish this would be the case for this area of Asheville.

31. The number of trips generated from the Hotel in the Traffic Assessment was also derived from an industry standard, and not the actual trips expected from this Hotel at this location. Hotels in downtown Asheville have an occupancy rate in excess of 85%, but the general rate for an efficient market is 65%. The Traffic Assessment did not take this expected higher occupancy of the Asheville market into account.

32. The Applicant did not submit any traffic data for Friday through Sunday, even though those are typically the days that tourists visit the City and traffic volumes are higher.

33. The estimated traffic counts used for the Traffic Assessment and Mr. Dean's opinion, were also these on a "typical weekday." There was no weekend data collected, even though this is the time that most tourists visit the Asheville downtown.

34. Without accurate traffic counts for any days other than Thursday November 10, there is no data or evidence to determine whether the additional trips generated by the Hotel (as well [as] those from the other tourists which the Hotel will attract but who do not stay at the hotel) would not decrease the existing level of service to an unacceptable level. The Level of Service Summary in the Traffic Assessment was not based on complete information or data.

35. There was no data or evidence presented that could show what the level of traffic would be with three hotels (Indigo, Hyatt and Embassy Suites) located within a several block area for Friday, Saturday and Sunday during the summer months or other high traffic periods.

36. The Traffic Assessment did not account for traffic that will be generated by future hotels and apartments in the downtown area that are planned and approved, but which are not yet fully constructed and operational.

37. The proposed Hotel includes a twenty-foot wide driveway, which provides street access to and from the parking structure and North French Broad Avenue.

38. There is a blind hill with limited visibility in the vicinity of the Hotel's parking deck[ ] entrance and exit onto North French Broad Avenue. To determine whether the addition of that entrance/exit would cause a safety issue would require a "sight distance check." A sight distance check was not a part of the Traffic Assessment and no other evidence was presented to show the parking deck entrance or exit would not endanger driver or pedestrian safety. The Traffic Assessment did no analysis relating to traffic safety as it relates to vehicles entering and exiting this driveway.

Based upon these findings of fact, the City Council concluded that PHG had failed to produce competent, material, and substantial evidence that the hotel (1) "will not materially endanger the public health or safety;" (2) "is reasonably compatible with significant natural and topographic features of the site and within the immediate vicinity of the site given the proposed site design and any mitigation techniques or measures proposed by the applicant;" (3) "will not substantially injure the value of the adjoining or abutting property;" (4) "will be in harmony with the scale, bulk, coverage, density, and character of the area or neighborhood in which it is located and, moreover, the evidence instead showed the Hotel would not be in harmony with the scale, bulk, coverage and character of the area and neighborhood;" (5) "will generally conform to the comprehensive plan, smart growth policies, sustainable economic development strategic plan and other official plans adopted by the City and, moreover, the evidence instead showed the Hotel would not generally conform to the City's 2036 Vision Plan;" and (6) "will not cause undue traffic congestion or create a traffic hazard."

On 16 March 2017, PHG filed a petition seeking the issuance of a writ of certiorari pursuant to N.C.G.S. § 160A-393 authorizing judicial review of the City Council's decision to deny its permit application in which PHG alleged that the City Council had (1) "erred as a matter of law by not accepting PHG's evidence as competent, material, and substantial evidence entitling PHG to a permit;" (2) made findings of fact not supported by substantial evidence; and (3) made findings of fact

that were arbitrary and capricious.[1]  On the same day, the requested writ of certiorari was issued.  The issues raised by PHG's petition were heard before the trial court at the 2 October 2017 civil session of Superior Court, Buncombe County.  On 2 November 2017, the trial court entered an order determining that PHG was entitled to the issuance of the requested conditional use permit and ordered that this matter be "remanded to the City of Asheville City Council with the directive that it grant PHG's application and issue it a Conditional Use Permit at its next regularly scheduled meeting."

In support of this decision, the trial court concluded that, contrary to the City Council's decision, the evidence submitted in support of PHG's request for the issuance of a conditional use permit "was competent, material and substantial and sufficient to establish a *prima facie* case of entitlement to a conditional use permit" and that, "[i]n deciding otherwise, the Council [had] made an error of law."  In addition, the trial court concluded that "the [C]ity's decision was not supported by substantial evidence appearing in the record" and was, instead, "arbitrary and capricious."  The trial court further determined that the testimony of Mr. Rawls concerning traffic safety-related issues was "incompetent as a matter of law" and that the City Council had failed to recognize that "PHG had only a burden of production,

---

[1] PHG also alleged that the City Council had violated its due process rights by pre-judging the permit request.  However, the trial court did not agree, and this issue was not appealed.

and not a burden of persuasion" at the first stage of this proceeding. The City noted an appeal to the Court of Appeals from the trial court's order.

In seeking relief from the trial court's order before the Court of Appeals, the City argued that the trial court had applied an incorrect standard of review when it "expressly and erroneously applied *de novo* review in evaluating whether the evidence was 'sufficient.'" In addition, the City contended that the trial court had erred by concluding that PHG had met its burden of eliciting competent, material, and substantial evidence tending to show that the hotel would not substantially injure the value of adjoining or abutting properties; cause undue traffic congestion or a traffic hazard; or be in harmony with the scale, bulk, coverage, density, and character of the area or neighborhood in which the proposed hotel was intended to be located.[2] Finally, the City contended that the trial court had erred by considering the recommendations that had been made by various City committees and advisory boards and by holding that the City Council's decision was arbitrary and capricious.

In rejecting the City's challenge to the trial court's order, the Court of Appeals began by concluding that the trial court had correctly applied the appropriate standard of review. *PHG Asheville, LLC v. City of Asheville*, 822 S.E.2d 79, 86 (N.C.

---

[2] The City failed to argue before the Court of Appeals that the trial court had erred by concluding that PHG had satisfied its burden of producing competent, material, and substantial evidence addressing the three ordinance criteria that are not discussed in the text of this opinion, thereby abandoning its right to challenge the trial court's decision with respect to those criteria on appeal. *See* N.C.R. App. P. 28(a) (stating that "[i]ssues not presented and discussed in a party's brief are deemed abandoned").

Ct. App. 2018) (stating that "[t]he superior court's order shows it did not weigh evidence, but properly applied *de novo* review to determine the initial legal issue of whether Petitioner had presented competent, material, and substantial evidence"). According to the Court of Appeals, "[t]he City Council's 44 findings of fact were unnecessary, improper, and irrelevant" because "[n]o competent, material, and substantial evidence was presented to rebut Petitioner's *prima facie* case, and no conflicts in the evidence required the City Council to make findings to resolve any disputed issues of fact." *Id.* The Court of Appeals reached this conclusion based upon N.C.G.S. § 160A-393(l)(2), which provides that "findings of fact are not necessary when the record sufficiently reveals the basis for the decision below or *when the material facts are undisputed and the case presents only an issue of law.*" *Id.* (cleaned up) (quoting N.C.G.S. § 160A-393(l)(2) (2017)). For that reason, the Court of Appeals held that any "whole record" review that the trial court might have conducted had been rendered unnecessary in light of its determination that PHG had presented competent, material, and substantial evidence that sufficed to establish the existence of a *prima facie* case of entitlement to the issuance of the permit and that no competent, material, and substantial evidence had been presented in opposition to PHG's request. *Id.* at 87. More specifically, the Court of Appeals held that Mr. Crozier's report and related testimony "constitute[d] material, as well as competent and substantial, evidence to show *prima facie* compliance with criteria 3," *id.* at 90, and that "[n]o competent, material, and substantial expert evidence *contra* was

presented at the hearing to show [that] Crozier's analysis was unsound or utilized an improper methodology." *Id.* at 89 (stating that "[t]he City Council's lay notion that Crozier's analysis is based upon an inadequate methodology does not constitute competent evidence under the statute to rebut his expert testimony and report"). Similarly, the Court of Appeals concluded that "[n]o competent, material, and substantial evidence was presented to refute Dean's traffic analysis," that Mr. "Dean [had] testified [that] his study was conducted in accordance with industry standards and used standard industry data and methods," and that "[t]he speculations of lay members of the public and unsubstantiated opinions of City Council members do not constitute competent evidence contra under the statutes and precedents to rebut Dean's traffic analysis." *Id.* at 91. As a result, for all of these reasons, the Court of Appeals affirmed the trial court's order. On 9 May 2019, this Court allowed the City's discretionary review petition.

In seeking to persuade us to overturn the Court of Appeals' decision, the City argues that, pursuant to this Court's holding in *Mann Media*, "a local government may deny a conditional use permit if, at the permit hearing, the developer is unable to definitively address whether the proposed development presents a safety risk" and "that this rule applies even when the safety risk is raised by members of the public whose testimony is ultimately inadmissible," citing *Mann Media, Inc. v. Randolph Cty. Planning Bd.*, 356 N.C. 1, 16–17, 565 S.E.2d 9, 19 (2002). In the City's view, "there is no meaningful difference between *Mann Media* and this case" given that, in

*Mann Media*, members of the public raised concerns about ice falling from a tower while, in this case, a member of the public raised a safety issue concerning the presence of a blind hill near a parking garage. The City argues, that, just like in *Mann Media*, "PHG's witness could not state with certainty—much less 'satisfactorily . . . prove' or '*guarantee*'—that the proposed development would not create a 'safety risk' " and that PHG's failure to adequately address this safety issue necessitated denial of PHG's permit, quoting *Mann Media*, 356 N.C. at 17, 565 S.E.2d at 19. In addition, the City argues that, "when the local government assesses the evidence at the permit hearing, the local government may rely on its knowledge of the local community," citing *Humble Oil & Refining Co. v. Bd. of Aldermen*, 284 N.C. 458, 468, 202 S.E.2d 129, 136 (1974). The City contends that, "instead of allowing local knowledge to inform local permitting decisions, the Court of Appeals expressly constrained local governments from considering that local knowledge." As a result, the City contends that the Court of Appeals' decision conflicts with our decisions in *Mann Media* and *Humble Oil* and that, "[i]f left undisturbed[, it] would usher in a new era of perfunctory, rubber-stamp review" of conditional use permits by local governing bodies.

Secondly, the City argues that "the Court of Appeals erred in its treatment of the City Council's factual findings." In the City's view, the City Council's findings of fact concerning traffic congestion and traffic hazards and its findings of fact

concerning the effect of the proposed hotel upon the value of surrounding properties had ample record support.[3]

In seeking to convince us to affirm the Court of Appeals' decision, PHG argues that "an applicant is entitled to a conditional use permit if the applicant meets its prima facie burden" of producing competent, material, and substantial evidence in support of each condition set out in the applicable land use ordinance. According to PHG, "the applicant only has a burden of production" rather than a burden of persuasion, with this burden of production having been "deliberately and appropriately [set at a] low [level] in conditional use permit cases because [the City] has already legislatively determined that the proposed use is an acceptable use at the location, subject to meeting the standards of a [conditional use permit]." For that reason, PHG contends that the issue of whether an applicant has met its initial burden to produce competent, material, and substantial evidence is a legal question subject to *de novo* review and that a reviewing court "is not bound by a municipality's factual findings" in making that decision. As a result, PHG asserts that "the City Council erred in denying the conditional use permit" because it met its burden of

_____

[3] The City has abandoned the contention that it advanced before the Court of Appeals that the trial court had erred by reversing the City Council's determination that PHG failed to meet its burden of producing competent, material, and substantial evidence that the development of the hotel would be in harmony with the scale, bulk, coverage, density and character of the area or neighborhood in which it is located by failing to bring that contention forward for our consideration in its new brief before this Court. *See* N.C.R. App. P. 28(a)

production regarding both traffic and property values and because "[t]he City Council's findings were not based on competent, material, and substantial evidence."

As this Court said just over forty years ago, "[t]he granting of a special exception is apparently not too generally understood." *Woodhouse v. Bd. of Comm'rs*, 299 N.C. 211, 218, 261 S.E.2d 882, 887 (1980) (quoting *Syosset Holding Corp. v. Schlimm*, 159 N.Y.S.2d 88, 89 (N.Y. Sup. Ct. 1956), *modified and aff'd*, 164 N.Y.S.2d 890 (N.Y. App. Div. 1957)). "A conditional use permit 'is one issued for a use which the ordinance expressly permits in a designated zone upon proof that certain facts and conditions detailed in the ordinance exist.' " *Id.* at 215–16, 261 S.E.2d at 886 (quoting *Humble Oil*, 284 N.C. at 467, 202 S.E.2d at 135).

By the time that a case arising from an application for the issuance of a conditional use permit reaches this Court, the proceeding in question has been subject to several levels of examination and review. As an initial matter, the application must be considered by the applicable local governmental body. *See* N.C.G.S. § 160A-388(a), (c) (2019). In the event that the local governmental body denies the application, the applicant has the right to seek judicial review of that decision by the superior court. *See id.* §§ 160A-388(e2)(2), -393. At the conclusion of that process, a disappointed litigant is entitled to seek appellate review of the trial court's decision in accordance with the relevant statutory provisions and the North Carolina Rules of Appellate Procedure.

At each step in this multi-level process, a distinct legal standard is applicable. According to well-established North Carolina law, the local governing board "must follow a two-step decision-making process in granting or denying an application for a [conditional] use permit." *Mann Media*, 356 N.C. at 12, 565 S.E.2d at 16. As an initial matter, the local governmental body must determine whether "an applicant has produced competent, material, and substantial evidence *tending to establish* the existence of the facts and conditions which the ordinance requires for the issuance of a [conditional] use permit." *Humble Oil*, 284 N.C. at 468, 202 S.E.2d at 136 (emphasis added). In the event that the applicant satisfies this initial burden of production, then "*prima facie* he is entitled to" the issuance of the requested permit. *Id.* At that point, any decision to deny the application "should be based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record," *id.*, with the local governmental body lacking the authority to "deny a permit on grounds not expressly stated in the ordinance" given that "it must employ specific statutory criteria which are relevant." *Woodhouse*, 299 N.C. at 218–19, 261 S.E.2d at 887.

The superior court " 'sits in the posture of an appellate court' and 'does not review the sufficiency of evidence presented to it but reviews that evidence presented to the town board.' " *Mann Media*, 356 N.C. at 12–13, 565 S.E.2d at 17 (quoting *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 626–27, 265 S.E.2d

379, 383 (1980)). In reviewing the local governmental body's decision, the superior

court is charged with:

> (1) Reviewing the record for errors in law,
>
> (2) Insuring that procedures specified by law in both statute and ordinance are followed,
>
> (3) Insuring that appropriate due process rights of a petitioner are protected including the right to offer evidence, cross-examine witnesses, and inspect documents,
>
> (4) Insuring that decisions of town boards are supported by competent, material[,] and substantial evidence in the whole record, and
>
> (5) Insuring that decisions are not arbitrary and capricious.

*Id.* at 13, 565 S.E.2d at 17 (quoting *Coastal Ready-Mix*, 299 N.C. at 626, 265 S.E.2d

at 383); *see also* N.C.G.S. § 160A-393(k)(1)(b) (2019) (providing that the superior court

should insure that the local governmental body's decision concerning a conditional

use permit was not "[i]n excess of the statutory authority conferred upon the city,

including preemption, or the authority conferred upon the decision-making board by

ordinance").

The exact nature of the standard of review to be utilized by the superior court

in any particular case "depends upon the particular issues presented on appeal."

*Mann Media*, 356 N.C. at 13, 565 S.E.2d at 17 (quoting *ACT-UP Triangle v. Comm'n*

*for Health Servs.*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997)). In the event that

the petitioner asserts that the local governmental body has committed an error of

law, then that contention is subject to *de novo* review. *Id.* Under the well-established *de novo* standard of review, "the superior court 'considers the matter anew and freely substitutes its own judgment for the [local governing board's] judgment.'" *Mann Media,* 356 N.C. at 13–14, 565 S.E.2d at 17 (cleaned up) (quoting *Sutton v. N.C. Dep't of Labor*, 132 N.C. App. 387, 389, 511 S.E.2d 340, 341 (1999)). The extent to which "the record contains competent, material, and substantial evidence is a conclusion of law, reviewable de novo." N.C.G.S. § 160A-393(k)(2) (2019).[4] In the event that the petitioner contends that the local governmental body's decision was either (1) arbitrary or capricious or (2) not supported by competent, material, or substantial evidence, the superior court is required to conduct a whole record review. *Mann Media*, 356 N.C. at 13, 565 S.E.2d at 17. In conducting a whole record review, the reviewing court "must 'examine all competent evidence' (the 'whole record') in order to determine whether the [local governing body's] decision is supported by 'substantial evidence.'" *Id.* at 14, 565 S.E.2d at 17 (quoting *ACT-UP Triangle*, 345

---

[4] PHG filed a motion seeking to have the City's appeal dismissed on the grounds that it had been rendered moot as a result of the enactment of Session Law 2019-111 on 28 June 2019, which added the language quoted in the text to N.C.G.S. § 160A-393(k)(2). *See* An Act to Clarify, Consolidate, and Reorganize the Land-Use Regulatory Laws of the State, S.L. 2019-111, § 1.9, https://perma.cc/G86W-WPR6. In PHG's view, the enactment of this legislation "definitively answered the principal question presented in this appeal: what is the appropriate standard of review for whether an applicant has met its prima facie burden of producing competent, material, and substantial evidence?" We are not persuaded by this argument. As an initial matter, S.L. 2019-111 states that it "clarif[ies] and restate[s] the intent of existing law and appl[ies] to ordinances adopted before, on, and after the effective date." *Id.* at § 3.1. In addition, the content of the applicable standard of review is not determinative in this instance. As a result, we deny PHG's motion to dismiss the City's appeal.

N.C. at 706, 483 S.E.2d at 392). Under the whole record test, the reviewing court is not allowed "to replace the board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*." *Id.* at 14, 565 S.E.2d at 17–18 (quoting *Thompson v. Wake Cty. Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977)). Any order that the superior court enters in the course of reviewing a local governmental board's decision relating to the issuance of a conditional use permit "must set forth sufficient information in its order to reveal the scope of review utilized and the application of that review." *Id.* at 13, 565 S.E.2d at 17 (citation omitted).

In the event that appellate review of the superior court's order is requested, the appellate court "examines the trial court's order for error[s] of law," with that "process ha[ving] been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly." *Id.* at 14, 565 S.E.2d at 18 (quoting *ACT-UP Triangle*, 345 N.C. at 706, 483 S.E.2d at 392). In the event that the case under consideration reaches this Court after a decision by the Court of Appeals, the issue before this Court is whether the Court of Appeals committed any errors of law. N.C.R. App. P. 16(a). For that reason, this Court is required to make the same inquiry that the Court of Appeals was called upon to undertake in reviewing the trial court's order. As a result, we will now examine whether the trial court utilized the appropriate standard of review and, if so, whether it did so properly.

As the record that is before us in this case clearly reflects, the trial court appropriately engaged in both *de novo* and whole record review. *Mann Media*, 356 N.C. at 15, 565 S.E.2d at 18 (stating that a "court may properly employ both standards of review in a specific case" as long as "the standards are to be applied separately to discrete issues" and the trial court "identif[ies] which standard(s) it applied to which issues" (citations omitted)). In addressing the issue of whether PHG adduced sufficient evidence to satisfy the applicable burden of production, the trial court stated that:

> Exercising de novo review, the Court concludes as a matter of law that the evidence presented by PHG and other supporting witnesses was competent, material and substantial and sufficient to establish a *prima facie* case of entitlement to a conditional use permit. In deciding otherwise, the Council made an error of law. A court reviews "de novo the initial issue of whether the evidence presented by a petitioner met the requirement of being competent, material, and substantial." *Blair Investments, LLC. v. Roanoke Rapids City Council*, 231 N.C. App. 318, 321, 752 S.E.2d 524, 527 (2013).

Thus, the trial court engaged in *de novo* review in analyzing PHG's challenge to the City Council's determination that PHG had failed to make the necessary *prima facie* showing of entitlement to the issuance of the requested conditional use permit.

As this Court has clearly held, the extent to which an applicant has presented competent, material, and substantial evidence tending to satisfy the standards set out in the applicable ordinance for the issuance of a conditional use permit is a question directed toward the sufficiency of the evidence presented by the applicant

and involves the making of a legal, rather than a factual, determination. *See Styers v. Phillips*, 277 N.C. 460, 464, 178 S.E.2d 583, 586 (1971) (stating that "[w]hether there is enough evidence to support a material issue is always a question of law for the court"). For that reason, we have previously analogized an applicant's burden of producing competent, material, and substantial evidence to support the issuance of a conditional use permit to the making of the showing necessary to overcome a directed verdict motion during a jury trial. *Humble Oil*, 284 N.C. at 470–71, 202 S.E.2d at 137 (stating that "[s]ubstantial evidence is more than a mere scintilla" and "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury" (citation omitted)).

In concluding that PHG presented sufficient evidence to support the issuance of the requested conditional use permit, the trial court recognized that "PHG submitted a large volume of evidence that its hotel project met all ordinance standards" and that the evidence that PHG elicited "included [testimony from] five witnesses [three of whom] were received as experts, without objection, and who presented live testimony and ample reports, also received without objection." In addition, the trial court noted that "no competent evidence opposing the . . . application appear[ed] in the record." The Court of Appeals held that "[t]he superior court's order shows it did not weigh evidence, but properly applied *de novo* review to determine the initial legal issue of whether Petitioner had presented competent, material, and substantial evidence." *PHG Asheville*, 822 S.E.2d at 86. We agree with

the Court of Appeals that the trial court utilized the appropriate standard of review with respect to this issue and did so properly.[5]

As the record reflects, PHG presented the testimony of two architects, an appraiser, a traffic engineer, a certified planner, and the Vice President of PHG who, between them, presented evidence concerning each of the standards enunciated in

---

[5] This Court did hold in *Mann Media* that, "[u]nder the whole record test, in light of petitioners' inability satisfactorily to prove that the proposed use would not materially endanger public safety, we are not permitted to substitute our judgment for that of [the governing board]" and "hold that petitioners failed to meet their burden of proving this first requirement and did not establish a *prima facie* case." *Mann Media*, 356 N.C. at 17, 565 S.E.2d at 19. The Court engaged in whole record review in *Mann Media* because the wording of the superior court's order "suggest[ed] that the superior court applied both [*de novo* and whole record review] simultaneously in several instances," a fact that left us "unable to conclude that the superior court consistently exercised the appropriate scope of review." *Id.* at 15, 565 S.E.2d at 18. Even so, we concluded that no remand was necessary "because the central issue presented by [the governing board] and argued by both parties on appeal is whether there was competent, material, and substantial evidence to support [the governing board's] denial of a [conditional] use permit," with "[r]esolution of this issue involv[ing] evaluation of evidence used by [the governing board] to deny the application" and with "the entire record of the hearing [being] before us." *Id.* As a result, the Court applied the whole record test in *Mann Media* "in the interests of judicial economy," *id.* at 16, 565 S.E.2d at 19, rather than because it was fundamentally altering the existing process for judicially reviewing challenges to the denial of conditional use permits and implicitly overruling decisions discussed in the text and cited without exception in *Mann Media* for the purposes for which we have cited them in this opinion, such as *Humble Oil*. *Id.* at 12, 565 S.E.2d at 16. In view of the fact that the trial court appropriately separated the issue of whether PHG had established the required *prima facie* case from the other issues that were before it at that time, there was no need for either the Court of Appeals or this Court to refrain from utilizing the ordinarily applicable standard of review, which *Mann Media* did nothing to change. In addition, the City has not cited any statutory provision or decision of this Court that in any way suggests that the manner in which its conditional use permit ordinance is couched has any effect upon the manner in which a decision refusing to issue a conditional use permit should be reviewed by either the trial or appellate courts. As a result, the issue of whether the applicant for a conditional use permit made out the necessary *prima facie* case does not involve determining whether the applicant met a burden of persuasion, as compared to a burden of production, and is subject to *de novo*, rather than whole record, review during the judicial review process.

the relevant portion of the City's land use ordinance. Mr. Crozier and Mr. Dean, whose testimony is at issue in the case as it has been presented to us, were each qualified as experts in their respective fields. Both Mr. Crozier and Mr. Dean submitted voluminous reports that contained extensive data detailing the basis for their conclusions. Mr. Crozier's appraisal report and testimony provided ample support for PHG's contention that the proposed hotel would not substantially injure the value of adjoining or abutting properties by detailing recent land sales in the area near the proposed hotel development and applying the principle of progression before concluding that the construction and operation of the proposed hotel would not injure the value of adjoining or abutting properties and would, instead, cause their values to increase. Similarly, Mr. Dean's traffic study and testimony provided ample support for PHG's contention that the proposed hotel would not cause undue traffic congestion or create a traffic hazard in light of the City staff's statement that "all we needed to provide was the trip generation table . . . as well as our anticipated distribution of those trips." Mr. Dean's analysis, which was performed in accordance with industry standards and utilized rates and equations developed by the Institute of Traffic Engineers, concluded that the traffic caused by the proposed development would result in only a "minimal impact" and would "only increase the overall delay at [nearby] intersections by about four seconds." We agree with the trial court and the Court of Appeals that the evidence that PHG presented before the City Council

sufficed to satisfy its burden of producing competent, material, and substantial evidence tending to show that it satisfied the relevant ordinance standards.

In light of the fact that PHG had made a sufficient showing to survive what amounted to a directed verdict motion and the City does not contend that the record contains any "evidence contra," the City Council's inquiry should have ended at this point. *See* N.C.G.S. § 160A-388(e2)(1) (2019) (stating that "[t]he board shall determine contested facts and make its decision within a reasonable time" by entering an order that "reflect[s] the board's determination of contested facts and their application to the applicable standards"); *see also id.* § 160A-393(l)(2) (stating that "findings of fact are not necessary when the record sufficiently reveals the basis for the decision below or when the material facts are undisputed and the case presents only an issue of law"). Instead, however, the City Council concluded that PHG had failed to make the necessary *prima facie* showing and attempted to support this determination with a series of findings of fact that rested upon incompetent testimony and questioned the credibility of the testimony provided by PHG's witnesses.

In defense of the approach that it took in considering PHG's application, the City argues that the Court of Appeals disregarded the findings of fact that are contained in its order and argues that the effect of the Court of Appeals' decision was that, "if no one shows up to oppose a project and introduce evidence in opposition, every new development would be a fait accompli." However, the basis upon which

the City seeks to have its decision upheld rests upon a misapprehension of the applicable law, under which "[a] denial of the permit should be based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record." *Humble Oil*, 284 N.C. at 468, 202 S.E.2d at 136. In other words, given that PHG elicited sufficient evidence to satisfy its burden of production to show an entitlement to the issuance of the requested conditional use permit, the City Council did, in fact, lack the authority to deny PHG's application in the absence of competent, material, and substantial evidence tending to support a different outcome.

The findings of fact contained in the City's order are simply inadequate to support the result that the City Council ultimately reached. As an initial matter, we note that the City Council's findings concerning property values and traffic-related issues lack any support in the admissible and competent evidence. Simply put, given the absence of any evidence that tended to conflict with Mr. Crozier's appraisal study, there were no factual issues relating to the property value issue which the City Council needed to resolve. Instead, the City Council's findings of fact fault Mr. Crozier for failing to include information that he had no reason, based upon an examination of the relevant ordinance language, to conclude would be needed or even relevant. For example, the City Council states in Finding of Fact No. 19 that "[t]here was no evidence, through facts and data, to indicate how the Hotel would affect or impact such an increase in value" despite the fact that the City's unified development

ordinance merely required PHG to produce evidence tending to establish that the proposed development would not substantially injure the value of adjoining or abutting properties without making any mention of a requirement that the applicant establish the amount by which the proposed development would affect the value of surrounding properties. Similarly, in Finding of Fact No. 20, the City Council faulted Mr. Crozier for failing to present comparable sales data relating to properties in other parts of Asheville or in entirely different cities. The fundamental problem with the City Council's justifications for refusing to credit the testimony of Mr. Crozier is that it held PHG to a burden that is simply not reflected in or supported by the relevant ordinance provisions. *See Woodhouse*, 299 N.C. at 219, 261 S.E.2d at 887–88 (stating that "[t]o hold that an applicant must first anticipate and then prove or disprove each and every general consideration would impose an intolerable, if not impossible, burden on an applicant for a conditional use permit," with an applicant not being required to "negate every possible objection to the proposed use").

The same deficiencies are present in the City Council's findings concerning traffic-related issues. Once again, no competent, material, or substantial evidence was presented in opposition to the conclusions drawn in Mr. Dean's analysis. In spite of the fact that Mr. Dean's uncontested testimony established that his traffic study had been performed in accordance with industry standards, the City Council questioned the credibility of the results reached in his study on the grounds that he had failed to base his study upon conditions specific to Asheville. Among other things,

the City Council criticized Mr. Dean for failing to base his traffic study upon data relating to conditions on the weekend or during the summer or fall seasons when tourist-related traffic in Asheville is at its height. Once again, the City Council's findings reflect an insistence upon the presentation of evidence that is never mentioned in the City's land use ordinance, which is a standard to which the applicant cannot lawfully be held. In addition, the City Council's findings also rested upon the testimony of Mr. Rawls, who raised questions about limitations upon the ability of persons exiting the hotel's parking garage to see up and down an adjoining street in spite of the fact that the General Assembly had determined that lay testimony concerning traffic conditions is not competent in conditional use permit proceedings. *See* N.C.G.S. § 160A-393(k)(3)(b) (2019) (stating that "[t]he term 'competent evidence,' as used in this subsection, shall, regardless of the lack of a timely objection, not be deemed to include the opinion testimony of lay witnesses as to . . . [t]he increase in vehicular traffic resulting from a proposed development [which] would pose a danger to the public safety"). As a result, the City Council's traffic-related findings do not justify a decision to reject Mr. Dean's analysis of the impact of the proposed hotel on traffic in the surrounding area.

A city council is, of course, entitled to rely upon the special knowledge of its members concerning conditions in the locality which they serve. However, this principle does not justify the City Council's decision to deny PHG's permit application in this case. In *Humble Oil*, a town alderman opposed the issuance of a conditional

use permit for a filling station in Chapel Hill, stating that the intersection near the proposed station "had been dangerous for twenty-eight years." *Humble Oil*, 284 N.C. at 469, 202 S.E.2d at 136. Before holding that this statement and others like it were nothing more than "conclusions unsupported by factual data or background" so as to be "incompetent and insufficient to support the Aldermen's findings," *id.,* we stated that

> [i]f there be facts within the special knowledge of the members of a Board of Aldermen or acquired by their personal inspection of the premises, they are properly considered. However, they must be revealed at the public hearing and made a part of the record so that the applicant will have an opportunity to meet them by evidence or argument and the reviewing court may judge their competency and materiality.

*Id.* at 468, 202 S.E.2d at 136.

As we have already noted, several members of the City Council mentioned facts within their special knowledge about the city that they represented during the quasi-judicial hearing held for the purpose of considering PHG's application. Among other things, various members of the City Council questioned Mr. Dean concerning the manner in which he conducted his traffic study, with their questions raising issues about the extent to which his study should have been based upon conditions existing at a different date and time. Aside from the fact that Mr. Dean was able to answer and provide reasonable explanations for his answers, nothing in the relevant ordinance provision required Mr. Dean to have anticipated these questions and to

have conducted his study in the manner that these questions seemed to believe to have been appropriate without sufficient advance notice to have permitted him to present any necessary rebuttal evidence. As a result, nothing in the special facts known to the members of the City Council in this case justified the making of a decision that PHG had failed to satisfy its burden of production or to reject PHG's permit application.

Finally, the City argues that this Court's decision in *Mann Media* requires a decision in its favor. In *Mann Media*, the Randolph County Planning Board denied an application for the issuance of a conditional use permit authorizing the construction and operation of a broadcast tower based upon concerns that ice would fall from the necessary support beams. *Mann Media*, 356 N.C. at 3–5, 565 S.E.2d at 11–12. After determining that the evidence presented in opposition to the issuance of the proposed permit constituted incompetent "anecdotal hearsay," *id.* at 17, 565 S.E.2d at 19, this Court held that "petitioners [had] failed to carry their burden of proving that the potential of ice falling from support wires of the proposed tower was not a safety risk" in light of the fact that the applicant had "candidly acknowledged his inability to state with certainty that ice would not travel a greater distance in the event of wind or storm," *id.*, and that, for that reason, "petitioners [had] failed to meet their burden of proving this first requirement [that the proposed tower would not materially endanger public safety] and did not establish a *prima facie* case." *Id.* The same result would not be appropriate in this case given that nothing in the relevant

ordinance provision, particularly given the advice that Mr. Dean received from the City staff, set forth any requirement that the sort of sight distance study that the City Council wanted to have been conducted was required in order to obtain the issuance of the requested conditional use permit. If Department of Transportation regulations do require a sight distance survey, it is not the City Council's role to enforce those regulations in the guise of implementing the City's ordinances relating to conditional use permits.

Thus, we hold that the Asheville City Council made a legislative decision to allow certain uses by right in specified zones "upon proof that certain facts and conditions detailed in the ordinance exist." *Woodhouse*, 299 N.C. at 215–16, 261 S.E.2d at 886 (quoting *Humble Oil*, 284 N.C. at 467, 202 S.E.2d at 135). The effect of the making of this decision was to bind the Asheville City Council to the use of quasi-judicial procedures and to exclusive reliance upon the substantive standards enunciated in the relevant provisions of its land use ordinance in determining whether conditional use permit applications should be granted or denied. *See id.* at 219, 261 S.E.2d at 887 (stating that, "[w]here a zoning ordinance specifies standards to apply in determining whether to grant a [conditional] use permit and the applicant fully complies with the specified standards, a denial of the permit is arbitrary as a matter of law" (quoting *Hay v. Township of Grow*, 206 N.W.2d 19, 22 (Minn. 1973))). As a result, in the event that an applicant for the issuance of a conditional use permit presents competent, material, and substantial evidence tending to show that it has

satisfied the applicable ordinance standards, it has made out a *prima facie* case of entitlement to the issuance of the conditional use permit, with any decision to deny the permit application being required to rest upon contrary findings of fact that have adequate evidentiary support. In view of the fact that PHG presented competent, material, and substantial evidence that its proposed hotel satisfied the relevant ordinance standards and the fact that no competent, material, and substantial evidence was presented in opposition to PHG's showing, the City simply lacked the legal authority to deny PHG's application. As a result, subject to the modified logic set forth in this opinion, we affirm the Court of Appeals' decision.

MODIFIED AND AFFIRMED.

Justice EARLS dissenting.

Here the majority overrules this Court's decision in *Mann Media, Inc. v. Randolph Cty. Planning Bd.*, in which the Court held that the question of whether a petitioner meets its burden of establishing a prima facie case for a conditional use permit is reviewed—not de novo—but rather under the whole record test, pursuant to which "we are not permitted to substitute our judgment for that of" the local government. 356 N.C. 1, 17, 565 S.E.2d 9, 19 (2002) ("Under the whole record test, in light of petitioners' inability satisfactorily to prove that the proposed use would not materially endanger public safety, we are not permitted to substitute our judgment for that of respondent. Accordingly, we hold that petitioners failed to meet their burden of proving this first requirement and did not establish a *prima facie* case."). In my view, under the whole record test, the Asheville City Council's determination that PHG Asheville, LLC (PHG), failed to meet its burden of establishing that the proposed use would not cause undue traffic congestion or a traffic hazard was not arbitrary or capricious. I would therefore reverse the decision of the Court of Appeals, which affirmed the superior court's reversal of the City Council's denial of PHG's application. Accordingly, I respectfully dissent.

While "[z]oning ordinances list uses that are automatically permitted in a particular zoning district," which "are . . . referred to as 'uses by right,' " "[m]any zoning ordinances also allow additional uses in each district that are permitted only

if specific standards are met; these are what are known as *special* and *conditional* uses." David. W. Owens, *Land Use Law in North Carolina*, at 159 (2d ed. 2011). As the majority notes, "[a] conditional use permit 'is one issued for a use which the ordinance expressly permits in a designated zone upon proof that certain facts and conditions detailed in the ordinance exist.'" *Woodhouse v. Bd. of Comm'rs of Nags Head*, 299 N.C. 211, 215–16, 261 S.E.2d 882, 886 (1980) (quoting *Refining Co. v. Bd. of Aldermen*, 284 N.C. 458, 467, 202 S.E. 2d 129, 135 (1974)). Notably, "[t]he standards underlying such permits include those that require application of some degree of judgment and discretion, as opposed to permitted uses where only objective standards are applied." Owens, *Land Use Law in North Carolina*, at 159.

When determining whether to grant a conditional use permit, the local government's authorized board[1] "operates as the finder of fact" and "must follow a two-step decision-making process" in making its determination:

> If "an applicant has produced competent, material, and substantial evidence tending to establish the existence of the facts and conditions which the ordinance requires for the issuance of a special use permit, *prima facie* he is entitled to it." If a prima facie case is established, "[a] denial of the permit [then] should be based upon findings contra which are supported by competent, material, and substantial evidence appearing in the record."

---

[1] "North Carolina law allows the final decision on a special or conditional use permit to be assigned to the governing board, the board of adjustment, or the planning board." Owens, *Land Use Law in North Carolina*, at 160.

*Mann Media*, 356 N.C. at 12, 565 S.E.2d at 17 (alterations in original) (quoting

*Humble Oil & Ref. Co. v. Bd. of Aldermen of Chapel Hill*, 284 N.C. 458, 468, 202

S.E.2d 129, 136 (1974)).  The "board sits in a quasi-judicial capacity" and

> must insure that an applicant is afforded a right to cross-examine witnesses, is given a right to present evidence, is provided a right to inspect documentary evidence presented against him and is afforded all the procedural steps set out in the pertinent ordinance or statute. Any decision of the town board has to be based on competent, material, and substantial evidence that is introduced at a public hearing.

*Id.* at 12, 565 S.E.2d at 16–17 (quoting *Coastal Ready-Mix Concrete Co. v. Bd. of*

*Comm'rs of Nags Head*, 299 N.C. 620, 626, 265 S.E.2d 379, 383 (1980)).  The board

"is 'without power to deny a permit on grounds not expressly stated in the ordinance'

and it must employ specific statutory criteria which are relevant."  *Id.* at 12, 565

S.E.2d at 16–17 (quoting *Woodhouse*, 299 N.C. at 218–19, 261 S.E.2d at 887); *see also*

Owens, Land Use Law in North Carolina, at 160 n.8 ("While the standards for the

permit involve application of a degree of discretion, the applicant is entitled to the

permit upon establishing that the standards will be met.").

This Court addressed the standard of review applicable to the denial of a

conditional or special use permit in *Mann Media*.  There, the petitioners sought a

special use permit to construct a broadcast tower in an area of Randolph County

zoned for residential and agricultural use.  *Mann Media*, 356 N.C. at 2, 565 S.E.2d at

11.  Randolph County's zoning ordinance provided that a special use permit may be

granted for public utilities, including broadcast towers, to be built in residential/agricultural areas, but required Randolph County's Planning Board (the Planning Board) to find four factors before granting the permit:

> (1) that the use will not materially endanger the public health or safety if located where proposed and developed according to the plan as submitted and approved;
>
> (2) that the use meets all required conditions and specifications;
>
> (3) that the use will not substantially injure the value of adjoining or abutting property, or that the use is a public necessity; and
>
> (4) that the location and character of the use if developed according to the plan as submitted and approved will be in harmony with the area in which it is to be located and in general conformity with the Land Development Plan for Randolph County.

*Id.* at 11, 565 S.E.2d at 16. After hearing the petitioners' evidence, the Planning Board found, *inter alia*, that "ice has formed and fallen from the other towers within the county's zoning jurisdiction causing damage and is likely to do so from the proposed tower." *Id.* at 3, 565 S.E.2d at 12. The Planning Board denied the permit, determining that the proposed use would materially endanger the public safety, would substantially injure the value of adjoining or abutting property, and would not be in harmony with the surrounding area. *Id.* at 4, 565 S.E.2d at 12. On appeal, the superior court reversed, concluding that the Planning Board's decision was not supported by competent, material, and substantial evidence. *Id.* at 7–8, 565 S.E.2d

at 14. In particular, the superior court determined that any evidence presented to the Planning Board concerning ice damage at other towers was incompetent, and therefore the Board's reliance on such evidence was arbitrary and capricious. *Id.* at 7–8, 565 S.E.2d at 14. A majority panel at the Court of Appeals affirmed the superior court, and the petitioners sought further review in this Court. *Id.* at 9, 565 S.E.2d at 15.

This Court stated that in appeals from denials of conditional use permits, the "superior court 'sits in the posture of an appellate court' and 'does not review the sufficiency of evidence presented to it but reviews that evidence presented to the town board.' " *Mann Media*, 356 N.C. at 12–13, 565 S.E.2d at 17 (quoting *Coastal Ready-Mix Concrete Co.*, 299 N.C. at 626–27, 265 S.E.2d at 383). The superior court's role consists of:

> (1) Reviewing the record for errors in law,
>
> (2) Insuring that procedures specified by law in both statute and ordinance are followed,
>
> (3) Insuring that appropriate due process rights of a petitioner are protected including the right to offer evidence, cross-examine witnesses, and inspect documents,
>
> (4) Insuring that decisions of town boards are supported by competent, material and substantial evidence in the whole record, and
>
> (5) Insuring that decisions are not arbitrary and capricious.

*Id.* at 13, 565 S.E.2d at 17 (quoting *Coastal Ready-Mix Concrete Co.*, 299 N.C. at 626, 265 S.E.2d at 383). The Court explained that the applicable standard of "judicial review 'depends upon the particular issues presented on appeal.' " *Id.* at 13, 565 S.E.2d at 17 (quoting *ACT-UP Triangle v. Comm'n for Health Servs.*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997)). Specifically, "[w]hen the petitioner 'questions (1) whether the agency's decision was supported by the evidence or (2) whether the decision was arbitrary or capricious, then the reviewing court must apply the 'whole record' test.' " *Id.* at 13, 565 S.E.2d at 17 (quoting *ACT-UP Triangle*, 345 N.C. at 706, 483 S.E.2d at 392). On the other hand, "[i]f a petitioner contends the [b]oard's decision was based on an error of law, 'de novo' review is proper." *Id.* at 13, 565 S.E.2d at 17 (quoting *Sun Suites Holdings, LLC v. Bd. of Aldermen of Garner*, 139 N.C. App. 269, 272, 533 S.E.2d 525, 527–28 (2000)). The Court stressed that "[t]hese standards of review are distinct," explaining:

> Under a *de novo* review, the superior court "consider[s] the matter anew[ ] and freely substitut[es] its own judgment for the agency's judgment." When utilizing the whole record test, however, the reviewing court must " 'examine all competent evidence (the "whole record") in order to determine whether the agency decision is supported by "substantial evidence." ' " "The 'whole record' test does not allow the reviewing court to replace the [b]oard's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it de novo."

*Mann Media*, 356 N.C. at 13–14, 565 S.E.2d at 17–18 (alterations in original) (citations omitted). The Court further elaborated that under the whole record test, a

"finding must stand unless it is arbitrary and capricious," and that in making this

determination

> the reviewing court does not have authority to override decisions within agency discretion when that discretion is exercised in good faith and in accordance with law.
>
> The "arbitrary or capricious" standard is a difficult one to meet. Administrative agency decisions may be reversed as arbitrary or capricious if they are "patently in bad faith," or "whimsical" in the sense that "they indicate a lack of fair and careful consideration" or "fail to indicate [ ]any course of reasoning and the exercise of judgment.[ ]"

*Id.* at 16, 565 S.E.2d at 19 (alterations in original) (citations omitted).

Applying these standards, the Court first examined the Planning Board's

finding that the proposed broadcast tower would "materially endanger the public

safety" due to the risk of ice falling from the tower. *Id.* at 16, 565 S.E.2d at 19. The

Court stated:

> In this finding, respondent cited evidence of ice building up and falling from other towers. Our review of the record indicates that this evidence, consisting principally of ice brought before respondent in a cooler and anecdotal hearsay, was not competent. Even so, the record also indicates that petitioners failed to carry their burden of proving that the potential of ice falling from support wires of the proposed tower was not a safety risk. Petitioner Mann testified that while the tower itself would have deicing equipment, the support wires would not. Although he opined that any ice forming on the wires would slide down the wires, he candidly acknowledged his inability to state with certainty that ice would not travel a greater distance in the event of wind or storm. While Mann argued that the prevailing winds at the site are from a direction that would blow any ice away from nearby

buildings and dwellings, he could not guarantee that falling ice would not be a risk. Other evidence in the record shows that numerous permanent structures lie in close proximity to the proposed tower site.

Respondent's finding that petitioners failed to establish that there would be no danger to the public from falling ice is neither whimsical, nor patently in bad faith, and it is not indicative of a lack of any course of reasoning or exercise of judgment. The burden is on petitioners to meet the four requirements of the Ordinance before finding that a *prima facie* case has been established, and respondent did not state in its written order that petitioners made a *prima facie* case. Under the whole record test, in light of petitioners' inability satisfactorily to prove that the proposed use would not materially endanger public safety, we are not permitted to substitute our judgment for that of respondent. Accordingly, we hold that petitioners failed to meet their burden of proving this first requirement and did not establish a *prima facie* case.

*Id.* at 17, 565 S.E.2d at 19. The Court ultimately[2] reversed the decision of the Court

of Appeals and remanded for further remand with directions for the superior court to

---

[2] Having concluded that the Planning Board's finding that the petitioners failed to establish a prima facie case with respect to the ordinance's first requirement was not arbitrary or capricious under the whole record test, the Court was "not obligated to address the remaining three requirements under the Ordinance." *Mann Media*, 356 N.C. at 17, 565 S.E.2d at 19 (citing *Coastal Ready-Mix*, 299 N.C. at 632–33, 265 S.E.2d at 386). Nonetheless, "in the interests of completeness," the Court addressed the third requirement ("that the use will not substantially injure the value of adjoining or abutting property") and because the petitioners' expert failed to address "*adjoining or abutting* properties," the Court held that "under the whole record test, . . . petitioners failed to meet the Ordinance's third requirement." *Id.* at 18, 565 S.E.2d at 20. The Court also addressed the fourth requirement ("that the location and character of the use if developed according to the plan as submitted and approved will be in harmony with the area in which it is to be located and in general conformity with the Land Development Plan for Randolph County") and determined that the superior court properly applied *de novo* review to this issue because it agreed with the Court of Appeals that, as a matter of law, "[t]he inclusion of a use as a conditional use in a particular zoning district establishes a prima facie case that the permitted use is in harmony with the

enter judgment affirming the Planning Board's denial of the special use permit. *Id.* at 19, 565 S.E.2d at 21.

Here, Asheville's ordinance provides that the "City Council *shall not* approve the conditional use application . . . *unless and until it makes the following findings*," including, *inter alia*, "[t]hat the proposed use will not cause undue traffic congestion or create a traffic hazard." (Emphases added.) Thus, as was the case in *Mann Media*, in order to establish a "*prima facie* case" for the conditional use permit under Asheville's ordinance, an applicant must not only meet a burden of production— evidence from which the fact-finder *could* make the requisite findings—but also a burden of persuasion—evidence from which the fact-finder *does* make the requisite findings.[3] *See Mann Media*, 356 N.C. at 17, 565 S.E.2d at 19 (stating that where the ordinance required the Planning Board to find four factors before granting the permit, "[t]he burden is on petitioners to meet the four requirements of the Ordinance before finding that a *prima facie* case has been established, and respondent did not state in

---

general zoning plan." *Id.* at 19, 565 S.E.2d at 20 (quoting *Mann Media, Inc. v. Randolph Cty. Planning Bd.*, 142 N.C. App. 137, 139, 542 S.E.2d 253, 255 (2001)). Yet, because the Court determined that the petitioners failed to establish a *prima facie* case as to the first and third requirements of the ordinance, it was unnecessary to address whether sufficient evidence was presented to rebut the petitioners' *prima facie* showing with respect to the fourth requirement. *Id.* at 19, 565 S.E.2d at 20.

[3] Admittedly, a "*prima facie* case" is typically synonymous with a burden of production. Nonetheless, regardless of terminology, it is clear under *Mann Media* that when an ordinance specifically requires the local board to in fact make necessary findings before a permit may permissibly be granted, the applicant must meet more than the burden of production before "*prima facie* he is entitled to" the permit. *Mann Media*, 356 N.C. at 12, 565 S.E.2d at 167.

its written order that petitioners made a *prima facie* case," and "hold[ing] that petitioners failed to meet their burden of proving this first requirement and did not establish a *prima facie* case."); Owens, *Land Use Law in North Carolina*, at 163 (stating that "the ordinance standards" at issue in *Mann Media* "required a finding that the use 'will not endanger the public health or safety" and that "[t]he [C]ourt upheld the permit denial based on a failure of the petitioner to meet the *burden of proof*[4] on this general standard" (emphasis added)); *see also, e.g.*, *Harding v. Bd. of Adjustment of Davie Cty.*, 170 N.C. App. 392, 394, 612 S.E.2d 431, 434 (2005) (holding that where Davie County's ordinance provided that a special use permit "shall not be granted unless" the Board of Adjustment made the requisite findings, the Board of Adjustment properly placed the burdens of production and persuasion on the applicant). Accordingly, the City Council properly noted in its order that "[t]he Applicant bears the burden of proving to the City Council, by competent, material and substantial evidence, that the proposed Hotel meets the seven CUP standards in the UDO."

---

4 "The burden of proof includes both the burden of persuasion and the burden of production." Black's Law Dictionary 209 (11th ed. 2019); *see also, e.g.*, *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 729, 693 S.E.2d 640, 648 (2009) (Timmons-Goodson, J., dissenting) ("The burden of proof in any case includes both the burden of production and the burden of persuasion. The burden of production, also known in North Carolina as the 'duty of going forward,' is '[a] party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling' such as a directed verdict or a judgment notwithstanding the verdict[.] The burden of persuasion, meanwhile, is the 'party's duty to convince the fact-finder to view the facts in a way that favors that party.' . . . The burden of persuasion is also often 'loosely termed [the] burden of proof.' " (citations omitted)).

Following the hearing, the City Council determined, *inter alia*, that PHG failed to prove that the proposed use "will not cause undue traffic congestion or create a traffic hazard," and made the following relevant findings:

> 8.     The Property's primary frontage is along Haywood Street, which borders the Property's entire northern property line.  The Property also has frontage along Carter Street, which borders the Property's entire western property line, and North French Broad Avenue, which is the only key pedestrian street which borders the Property.  The Hotel is oriented towards Haywood Street.
>
> . . . .
>
> 11.     Ninety percent of the existing improvements in the area are one and two story structures and approximately 72 percent of those structures are less than 10,000 square feet.  The Hotel would constitute the third hotel within a several block radius (approximately ¼ mile).  The addition of this third hotel would change the visual character of the area, and would create a cluster of hotels in the immediate vicinity, where there were previously smaller buildings and more diverse uses.
>
> . . . .
>
> 16.     There is a significant amount of pedestrian traffic in the area near and around the Carter Street Driveway.
>
> 17.     The Carter Street Driveway is 28 feet wide, which is wider than the 24 foot driveway width allowed by City Standards.  The Applicant obtained a modification from the City's Transportation Department Director to allow for the wider driveway.  The Transportation Department Director's written decision to allow the modification, however, does not address the impact of the wider driveway on the public health and safety and there was no evidence presented that would indicate the wider

driveway would provide the same level of protection to the public, particularly pedestrians, as a driveway which would comply with City requirements.

. . . .

27. There is significant traffic in downtown Asheville near and around the Property in September and October, and in the summer months. The vehicular traffic in the area will increase if the Hotel is constructed.

28. The Applicant presented the testimony of a traffic engineer, Kevin Dean, as well as Mr. Dean's written "Traffic Assessment." The Traffic Assessment did not provide any facts or data which could show the level of traffic or traffic counts for any time of the year, except during a four hour period during the day on November 10, 2016, which was a Thursday. The level of traffic in this area is much higher at other times of the year, particularly the summer months; however, there were no traffic counts or any traffic data provided for any date other than November 10.

29. Mr. Dean was not aware of the environmental conditions on November 10, 2016, or whether such conditions could have affected traffic volumes on that date.

30. The Applicant's traffic counts were done on November 10, 2016 between the hours of 7 a.m. and 9 a.m., and between the hours of 4 p.m. and 6 p.m. Under industry standards, this is apparently "assumed" to be the time of highest traffic on nearby streets, but there was no evidence which could establish this would be the case for this area of Asheville.

31. The number of trips generated from the Hotel in the Traffic Assessment was also derived from an industry standard, and not the actual trips expected from this Hotel at this location. Hotels in downtown Asheville have an occupancy rate in excess of 85%, but the general rate for an efficient market is 65%. The Traffic Assessment

did not take this expected higher occupancy of the Asheville market into account.

32.     The Applicant did not submit any traffic data for Friday through Sunday, even though those are typically the days that tourists visit the City and traffic volumes are higher.

33.     The estimated traffic counts used for the Traffic Assessment and Mr. Dean's opinion, were also these on a "typical weekday."   There was no weekend data collected, even though this is the time that most tourists visit the Asheville downtown.

34.     Without accurate traffic counts for any days other than Thursday November 10, there is no data or evidence to determine whether the additional trips generated by the Hotel (as well those from the other tourists which the Hotel will attract but who do not stay at the hotel) would not decrease the existing level of service to an unacceptable level.  The Level of Service Summary in the Traffic Assessment was not based on complete information or data.

35.     There was no data or evidence presented that could show what the level of traffic would be with three hotels (Indigo, Hyatt and Embassy Suites) located within a several block area for Friday, Saturday and Sunday during the summer months or other high traffic periods.

36.     The Traffic Assessment did not account for traffic that will be generated by future hotels and apartments in the downtown area that are planned and approved, but which are not yet fully constructed and operational.

37.     The proposed Hotel includes a twenty-foot wide driveway, which provides street access to and from the parking structure and North French Broad Avenue.

38.     There is a blind hill with limited visibility in the vicinity of the Hotel's parking deck's entrance and exit onto North French Broad Avenue. To determine whether the addition of that entrance/exit would cause a safety issue would require a "sight distance check." A sight distance check was not a part of the Traffic Assessment and no other evidence was presented to show the parking deck entrance or exit would not endanger driver or pedestrian safety. The Traffic Assessment did no analysis relating to traffic safety as it relates to vehicles entering and exiting this driveway.

39.     The Hotel will have 5,000 square feet of meeting space, which would potentially attract visitors to the Hotel, other than guests staying at the Hotel. This meeting space use was not included in the Traffic Assessment nor included in the traffic analysis.

40.     The Hotel would bring more than 50,000 new visitors to the City each year. Not all of these new visitors would be patrons of the Hotel, but would frequent downtown businesses and, therefore, add to the already dense downtown area. The Traffic Assessment did not account for any traffic caused by additional visitors, other than an estimate of trips by Hotel patrons and employees.

41.     The Hotel parking deck would have 200 vehicular parking spaces. The Hotel contains 185 rooms and will have 75 employees. There are insufficient spaces in the proposed Hotel parking deck to accommodate this number of guests and employees, even if they all do not drive automobiles to the Hotel.

42.     There is currently a shortage of public parking in downtown Asheville and there are often insufficient parking spaces to meet the demand. The development of the Hotel would exacerbate the parking shortages in the area, because of the limited number of parking spaces planned in the parking deck and the Applicant's failure to provide sufficient parking to accommodate all of its guests and employees.

As in *Mann Media*, we review the City Council's determination of whether PHG established a *prima facie* case and met its burden of proof under the ordinance under the whole record test, pursuant to which a finding "must stand unless it is arbitrary and capricious." *Mann Media*, 356 N.C. at 16, 565 S.E.2d at 19.

An examination of the record establishes that, at the hearing, PHG presented evidence noting that Asheville is not only "a tourist destination," but "is the hub of both commercial and tourist activity in Western North Carolina" and is "defined by its picturesque mountainous landscape." The report of PHG's real estate appraiser, Tommy Crozier, provided that the site of the proposed hotel "has an excellent location across from the Hotel Indigo and the new Hyatt Place hotel," and further that "[i]n the current market cycle, several large scale redevelopments downtown have been completed or are planned for near-term construction," including three recently opened hotels and six hotels currently in development among the "[n]otable projects." PHG acknowledged a concern with the proliferation of hotels in downtown Asheville, with its representatives stating that "[w]e know that there are questions about the overbuilding of hotels in downtown Asheville" and "[w]e do realize there's a lot of other hotels." PHG asserted that its proposed hotel is "a little bit different from some of the offerings at some of the other hotels" and addresses "an important niche in the hospitality of downtown Asheville" in that, in addition to its 185 rooms and its "detached, multi-level parking garage," it has "5000 square feet of meeting space, that

will, hopefully, essentially will create its own demand." This meeting space would constitute "the second largest meeting space for hotels specifically in the downtown market area," according to PHG, and would "help [ ] to capture additional meetings and events that otherwise may move to Greenville or other cities." Crozier testified that "this hotel will generate somewhere north of 50,000 new visitors a year."

Additionally, PHG presented testimony from Kevin Dean, an engineer, who analyzed five intersections near the site of the proposed hotel and prepared a "traffic assessment" summarizing his findings. Dean's assessment "present[ed] trip generation, distribution, and traffic analyses of the existing and existing + site conditions" and states that "all of the study intersections are expected to continue to operate at acceptable levels of service with only minor increases in delay" and that "simulations show no queuing issues at any of the study intersections or on any of the I-240 ramps." At the hearing, Dean was asked about his decision to pick a Thursday in November to examine the potential for traffic congestion in downtown Asheville:

> COUNCILMAN BOTHWELL: My question, my first question is, why did you pick November 10th, a Thursday, to do your traffic study?

> MR. DEEN[5]: Traffic studies are -- traffic counts are only supposed to be counted between Tuesdays and Thursdays to get a typical weekday condition that's not affected by a Monday or Friday variation. So that's industry standard. We are required, typically, to only count on Tuesdays, Wednesdays, or Thursdays.

---

[5] The transcript of the hearing misspells Mr. Dean's name as "Deen."

. . . .

COUNCILMAN BOTHWELL: I am wondering about the choice of November, too. I mean, we have, say, September and October, we have a lot of tourist traffic here. Summertime it's jammed all the time.

MR. DEEN: Sure.

COUNCILMAN BOTHWELL: And your report says there's no expectation of [queuing].

MR. DEEN: Sure.

COUNCILMAN BOTHWELL: But there is also [queuing] at where you turn off of Montford and then go to North French Broad, it sometimes backs up all the way across the bridge.

MR. DEEN: Okay.

COUNCILMAN BOTHWELL: And, again, with traffic coming from the eastbound exit with -- when you get to that light and turn left into the hotel. --

MR. DEEN: Okay.

COUNCILMAN BOTHWELL: -- to the new entrance --

MR. DEEN: Sure.

COUNCILMAN BOTHWELL: -- won't that cause [queuing] on Haywood Street waiting to turn into the left?

MR. DEEN: So I can't argue with your anecdotal stories. What I can tell you is the amount of traffic that's going to be added is only supposed to be negligible increase to any cues that you would see. I mean, five seconds -- five percent of the intersection or less. I think it's closer to three percent at that intersection, which is very mild.

-17-

COUNCILMAN BOTHWELL:  Okay

MR. DEEN: So I would just go to say that it's not going to cause any undue additional issues.

When asked whether his assessment took into account the current development in that area, including the "other hotels and other apartments, et cetera, that are either planned or just recently added," Dean stated "[w]e did not."  According to Dean, any potential increase in traffic from other development in the area, though unaccounted for by his traffic assessment, would only lessen the impact of the proposed hotel. Dean testified:

> MR. DEEN:  . . . Now, like you said, there are other developments that would come in that would be growth that would be inherent to an area.  But what I would argue would be that if we don't include that traffic, our site will appear to have a greater impact than it will at those times.
>
> So if there's more traffic, if there's more traffic on the network, then our 70 trips will be a smaller percentage than they are today.  Does that make sense?
>
> . . . .
>
> MR. DEEN:  Okay.  And I would argue that if the volumes were truly higher than our site, traffic would be an even smaller percent than it already was.
>
> MAYOR MANHEIMER:  That doesn't make sense.

A member of the public, Charles Rawls, raised the issue of a potential "blind hill" near the hotel's proposed parking garage, "turn[ing] from Haywood Street heading south on French Broad."  Mr. Dean, when asked if he had studied whether

-18-

the entrance and exit of the hotel's proposed two hundred space parking garage could adversely affect safety, stated:

> I have not. We did not conduct a sight distance check, which is typically what's required. But DOT typically requires driveways to meet certain sight distance requirements, whether vehicles are stopping or turning or making decisions, like you said, a vehicle entering a driveway. So DOT typically requires certain standards to be met. We didn't do that because we weren't involved in the actual design of the site.

The City Council also asked PHG about issues with parking, of which PHG acknowledged, "of course we're aware that there are parking issues in the area." In particular, the City Council asked about the capacity of the hotel's proposed parking deck:

> COUNCILMAN SMITH: How many spaces are there?
>
> MR. OAST: 200.
>
> COUNCILMAN SMITH: And 185 rooms and how many employees?
>
> MR. WALDEN: Roughly 75.
>
> COUNCILMAN SMITH: Where are the employees going to park?
>
> MR. WALDEN: In that general area.
>
> COUNCILMAN SMITH: Okay. So there will be an impact. That's another impact. That's helpful to know.
>
> . . . .

> COUNCILMAN YOUNG: And approximately 75 employees?
>
> MR. WALDEN: Yes, Sir.
>
> COUNCILMAN YOUNG: And the employees will probably park in the adjacent area?
>
> MR. WALDEN: Yes.

PHG, which also owns the recently opened "Hyatt Place" across the street from the proposed hotel, confirmed that some of the Hyatt Place's employees were using the site of the proposed hotel for parking:

> COUNCILWOMAN MAYFIELD: Where do your employees who work at this Hyatt Place park? Do they park in that hotel's deck?
>
> MR. WALDEN: They park on site here at Hyatt Place, and then they do use part of our -- our lot right now across the street, as well as the -- around the surrounding area.
>
> . . . .
>
> COUNCILMAN YOUNG: So when it's built, if it's built, the adjacent -- the parking that your employees use across the street now will go away.
>
> MR. WALDEN: Yes.
>
> COUNCILMAN YOUNG: And on top of that will go away, you would also incur parking from the current employees that will be employed by the Embassy now. So the people across the street parking would lose their parking now, and the current employees would also have to find parking.

-20-

MR. WALDEN: Yes, sir, but in a very limited capacity.

. . . .

COUNCILWOMAN MAYFIELD: I'm not hearing you say directly that you will provide parking for all of you employees in that -- in that deck.

And so the concern is that this -- this hotel would be adding to the -- would be bringing more people there on a daily basis, the workers who work at the hotel --

MR. WALDEN: Right.

COUNCILWOMAN MAYFIELD: -- and not provide them a place to park, which would make parking in that area even more difficult.

MR. WALDEN: Sure.

COUNCILWOMAN MAYFIELD: So that's a concern.

MR. WALDEN: Sure.

COUNCILWOMAN MAYFIELD: Is that a valid concern, or can you tell us that you[r] employees will have a place to park in that deck on a regular basis and will not be adding to the already overloaded shortage -- that's not -- adding to the shortage of parking that's already there.

MR. WALDEN: I do not feel that our employees would add to that burden. I feel that it's sufficient within the amount of spaces that we have. With valet and a number of spots, I do not feel that it would add an additional burden to the parking situation.

In my view, the City Council's finding that PHG failed to establish that the proposed use "will not cause undue traffic congestion or create a traffic hazard" "is

neither whimsical, nor patently in bad faith, and it is not indicative of a lack of any course of reasoning or exercise of judgment." *Mann Media*, 356 N.C. at 17, 565 S.E.2d at 19. Rather, the City Council's decision was based on legitimate concerns that were insufficiently addressed by PHG's evidence, including the exacerbation of the acknowledged parking issues in the area, the potential hazard created by the hotel's driveway, and the impact of recent and planned hotels and other developments on traffic congestion in the area, which was not considered in Mr. Dean's traffic assessment.

In that latter respect, Mr. Dean suggested that any traffic congestion unaccounted for in his assessment would only lessen the proposed hotel's impact on traffic because the hotel's impact would then amount to a smaller percentage of overall traffic in downtown Asheville. This assertion, however, does not address what is required by the ordinance. For example, it does not address whether Mr. Dean's earlier conclusions that "study intersections are expected to continue to operate at acceptable levels of service with only minor increases in delay" and that "simulations show no queuing issues at any of the study intersections" would be affected when the impact of the proposed hotel is assessed in conjunction with the realities of the traffic impact from the major developments not considered by Mr. Dean's assessment.

Moreover, Mr. Dean also failed to explain why it was appropriate to use a Thursday in November to examine the potential for traffic congestion in downtown Asheville, "the hub of . . . tourist activity in Western North Carolina." While the

majority assigns some talismanic quality to Mr. Dean's assertion that this was an "industry standard," Mr. Dean never elaborated on the nature of this standard or, more importantly, explained why this undefined "industry standard" was an appropriate method of addressing the specific requirement in *this* municipal ordinance—that is, whether the proposed hotel in downtown Asheville, along with its "detached, multi-level parking garage" and "5000 square feet of meeting space, that . . . will create its own demand," will cause undue traffic congestion or create a traffic hazard. Absent such an explanation, it was not arbitrary or capricious for the City Council to find unpersuasive the use of a weekday in November to assess potential traffic congestion in downtown Asheville.

The majority, noting that "[w]hen an applicant has produced competent, material, and substantial evidence tending to establish the existence of the facts and conditions which the ordinance requires for the issuance of a special use permit, [p]rima facie he is entitled to it," *Humble Oil*,[6] 284 N.C. at 468, 202 S.E.2d at 136,

---

[6] In *Humble Oil*, the Court determined that the Board of Alderman's denial of the petitioner's permit application must be set aside because the Board did not refer the application to the Planning Board for review before acting on it, as required by the ordinance. *Humble Oil*, 284 N.C. at 466-68, 202 S.E.2d at 135–36. The Court did not address whether the petitioner met its prima facie burden and the Court's only references to "de novo" were in its statements that on remand the Board of Alderman must "consider Humble's application De novo." *Id.* at 471, 202 S.E.2d at 138. The Court did "deem it expedient" to also address on appeal the Board's finding that the proposed use "would materially increase the traffic hazard and danger to the public at this intersection" and to determine whether the finding "is arbitrary in that it is unsupported by competent, material, and substantial evidence." *Id.* at 468, 202 S.E.2d at 136. The Court determined that the anecdotal evidence purportedly supporting this finding was "unsupported by factual data or background," and therefore incompetent and insufficient to support the finding. *Id.* at 469, 202 S.E.2d at 136. Unlike

asserts that PHG was only required to meet a burden of production to establish a *prima facie* case. This ignores the plain language of Asheville's ordinance ("The Asheville City Council *shall not approve* the conditional use application . . . *unless and until it makes the following findings*" (emphases added)), which, like the ordinance in *Mann Media*, places the burden of persuasion on the applicant, requiring the applicant to prove to the fact-finder—here the City Council—each of the necessary standards. *See Mann Media*, 356 N.C. at 17, 565 S.E.2d at 19 (stating that "[t]he burden is on petitioners to meet the four requirements of the Ordinance before finding that a *prima facie* case has been established, and respondent did not state in its written order that petitioners made a *prima facie* case," and that "petitioners failed to meet their burden of proving this first requirement and did not establish a *prima facie* case"). In other words, "the facts and conditions which the ordinance requires

---

the Asheville City Council's finding here that PHG did not meet its prima facie burden because it "failed to produce competent, material and substantial evidence that the Hotel *will not* cause undue traffic congestion or create a traffic hazard," which is based on the absence of evidence, the Board of Alderman's finding in *Humble Oil* is an affirmative finding ("*would materially increase* the traffic hazard and danger") purporting to be based on evidence in the record contrary to the petitioner. The significance of this distinction is illustrated in *Mann Media*, in which the Court held that the Planning Board's affirmative finding "that ice has formed and fallen *from the other towers* . . . and is likely to do so from the proposed tower, and *would therefore materially endanger* the public safety" was based on anecdotal hearsay and not supported by competent evidence; yet, the Court held that in light of the petitioners' inability to state with sufficient certainty that there was no danger from "the potential of ice falling *from support wires of the proposed tower*," under the whole record test, the Planning Board's "finding that petitioners failed to establish that there *would be no danger* to the public from falling ice is neither whimsical, nor patently in bad faith, and it is not indicative of a lack of any course of reasoning or exercise of judgment." *Mann Media*, 356 N.C. at 16–17, 565 S.E.2d at 19 (emphases added).

for the issuance of" the permit are that the City Council specifically makes the seven relevant findings, including that "[t]hat the proposed use will not cause undue traffic congestion or create a traffic hazard."

Moreover, the majority ignores that under *Mann Media*, the City Council's determination of whether PHG established a *prima facie* case is reviewed under the whole record test, pursuant to which "we are not permitted to substitute our judgment for that of respondent." *Id.* at 17, 565 S.E.2d at 19; *see also id.* at 17, 565 S.E.2d at 19 (stating that "[u]nder the whole record test, [a] finding must stand unless it is arbitrary and capricious" and that the Planning Board's "finding that petitioners failed to establish that there would be no danger to the public from falling ice is neither whimsical, nor patently in bad faith, and it is not indicative of a lack of any course of reasoning or exercise of judgment."). Instead, the majority erroneously applies de novo[7] review and substitutes its own judgment for that of the City Council.

---

[7] Notably, the legislature recently amended N.C.G.S. § 160A-393(k), providing that "[w]hether the record contains competent, material, and substantial evidence is a conclusion of law, reviewable de novo." PHG contends that this "clarifying" amendment renders the appeal moot because it answers "[t]he central question" here of "what standard of review applies to a municipality's denial of a conditional use permit when the denial is based on an alleged failure to present a prima facie case." Yet, the question of "[w]hether the record contains" a sufficient quantum of evidence is an inquiry into a party's burden of production. Asheville's ordinance, like the ordinance in *Mann Media*, specifically requires the applicant to meet a burden of persuasion, mandating that the "City Council *shall not approve* the conditional use application . . . *unless and until it makes the following findings*." (Emphases added.) Thus, as in *Mann Media*, the "*prima facie* case" in this particular context requires an applicant to meet, not a burden of production (i.e. producing evidence from which the City Council *could* find that the proposed use will not cause undue traffic congestion), but a burden of persuasion (producing evidence from which the City Council *does* find that the proposed use will not cause undue traffic congestion). The City Council's finding in this respect is

"The 'arbitrary or capricious' standard is a difficult one to meet." *Id.* at 16, 565 S.E.2d at 19. Because the City Council's finding that PHG failed to prove that the proposed use will not cause undue traffic congestion or create a traffic hazard "is neither whimsical, nor patently in bad faith, and it is not indicative of a lack of any course of reasoning or exercise of judgment," it is not arbitrary or capricious and therefore "must stand." *Id.* at 16, 565 S.E.2d at 19.[8] As such, the Court of Appeals and superior court should be reversed, and the decision of the City Council denying the conditional use permit should be affirmed. Accordingly, I dissent.

Justice HUDSON joins in this dissenting opinion.

---

reviewed under the whole record test. *Mann Media*, 356 N.C. at 17–18; 565 S.E.2d at 20.

[8] Because PHG failed to prove this requirement of the ordinance, it is unnecessary to address the remaining requirements. *Mann Media*, 356 N.C. at 17, 565 S.E.2d at 19 (stating that "petitioners failed to meet their burden of proving this first requirement and did not establish a prima facie case," and that "[b]ecause of this holding, we are not obligated to address the remaining three requirements under the Ordinance").